GARWOOD, Circuit Judge:
 

 The district court, on motion for summary judgment by defendants-appellees Ban-que Paribas-London (Paribas-London) and Banque Paribas (Suisse) S.A. (Paribas-Suisse), formerly Banque de Paris et des Pays-Bas (Suisse) S.A., dismissed with prejudice the voidable preference claim under the Bankruptcy Code, 11 U.S.C. § 547, of the Creditors’ Committee (the Committee) of Coral Petroleum, Inc. (Coral), a debtor now in chapter 11. The district court held that the $35,000,000 pledged by Leeward Petroleum Company, Ltd. (Leeward), a solvent, indirect, offshore subsidiary of Coral, to Paribas-Suisse was “earmarked” to repay Coral’s $35,000,000 debt to Paribas-Suisse and thus never became a part of Coral’s estate with respect to the preference claim. Finding that this Leeward collateral never came into the general control of Coral, we affirm the district court’s dismissal of the Committee’s preference action.
 

 Facts and Proceedings Below
 

 On August 26, 1982, Paribas-Suisse loaned Coral $35,000,000 pursuant to a term note. The note obligated Coral to repay the principal on September 1, 1984, and to bring the interest current on three designated dates. The loan was prepaya-ble without penalty at any time. As collateral for this loan, Coral executed a stock pledge of sixty-five percent of the stock of each of its subsidiaries. Coral also granted Paribas-Suisse a general security interest in all its assets. To avoid being charged with certain interbank taxes and charges, interbank arrangements were made for the funds to be provided Coral from Paribas-London as agent for Paribas-Suisse. Thus, Paribas-London funded the loan on behalf of Paribas-Suisse, which assumed the credit risk and carried the loan on its books. Coral’s term note evidencing this loan was payable to Paribas-Suisse.
 
 [1]
 

 Leeward, an indirect subsidiary of Coral, deposited $35,000,000 with Paribas-Suisse that the evidence established was to serve as pledged collateral for Paribas-Suisse’s loan to Coral. Paribas-Suisse thereafter placed a fiduciary deposit of this amount in its own name at Paribas-London to avoid certain taxes, and Paribas-Suisse retained control of the funds at all times with respect to Coral and Leeward.
 
 [2]
 
 On January 14, 1983, this pledge agreement was memorialized in a “General Form of Pledge Agreement” that gave Paribas-Suisse a right of pledge and offset on any Leeward deposit against any claims Paribas-Suisse might have against Coral. Moreover, the sixty-five percent pledge of all of Coral’s subsidiaries’ stock also included Leeward’s stock.
 

 On May 9, 1983, William Sudhaus, the president of Coral, telephoned Han Hayim, the vice president of Paribas-Suisse and the loan officer on the Coral account, and informed him that Coral had decided to prepay the note. Coral also informed Leeward
 
 *1354
 
 of this fact. On the same day, Leeward sent a telex to Paribas-Suisse (Nassau), a branch office of Paribas-Suisse, instructing Paribas-Suisse to break its $35,000,000 fiduciary deposit at Paribas-London and to transfer this sum to Leeward’s Paribas-Suisse account in Geneva. A few minutes thereafter, Leeward telexed Paribas-Suisse in Geneva, instructing it to transfer the $35,000,000 from Leeward’s Paribas-Suisse account in Geneva into Coral’s account at Paribas-Suisse in Geneva. Also on May 9, 1983, Coral telexed Paribas-Suisse directing that the incoming $35,000,000 be applied to repay its loan obligation to Paribas-Suisse. On May 10, 1983, Paribas-Suisse debited and credited Coral’s account — and also Leeward’s — at Paribas-Suisse in Geneva in a simultaneous bookkeeping transaction in accordance with these instructions, thus paying off Coral’s loan. Lastly, Paribas-Suisse refunded to Paribas-London the $35,000,000 that Paribas-London had advanced for Paribas-Suisse to Coral to originally fund the loan.
 

 On June 2, 1983, Coral filed for bankruptcy under chapter 11, and the Committee was appointed shortly thereafter to safeguard the rights of the unsecured creditors. The Committee determined that the above transaction, having occurred within ninety days of the bankruptcy petition, constituted a voidable preference under 11 U.S.C. § 547 of the Bankruptcy Code. Coral, however, would not bring suit and informed the Committee that it had proposed a settlement with Paribas-Suisse of a dispute in a matter unrelated to this transaction in which Coral would issue Paribas-Suisse a general release of all claims, including those for preferences. The bankruptcy court heard argument on the preference claim in its determination of whether to approve this release, and it denied the Committee’s preference claim and approved the settlement. The bankruptcy court’s ruling approving the settlement was made conditional on an ultimate finding that no preference existed. The settlement was approved and adopted by the district court, Judge DeAnda.
 

 In July 1984, the Committee filed the present suit in the district court, seeking a separate determination of whether this transaction constituted a preference. The Committee claimed standing to sue Pari-bas-Suisse or Paribas-London in light of Coral’s refusal to proceed in this matter against either of them. In February 1985, a stipulation executed by Coral was filed in the bankruptcy court expressly granting the Committee the right to sue Paribas-London for any reason, including preference claims. In April 1985, a stipulation by Coral was filed in the bankruptcy court granting the Committee standing to pursue any action that Coral did not bring by April 1, 1985. In July 1985, the Committee obtained the signature of Coral’s counsel on a document stating that the April stipulation was intended to allow the Committee to prosecute the instant preference claim.
 

 In October 1984, Paribas-Suisse and Pari-bas-London filed a motion to dismiss the preference claim under Fed.R.Civ.P. 12(b), which the district court treated as a motion for summary judgment under Fed.R.Civ.P. 56. On August 29, 1985, after reviewing the evidentiary record before it, the district court, Judge McDonald, dismissed the Committee’s preference claim. The district court held that the Committee did not have standing to sue Paribas-Suisse, but that it could sue Paribas-London because the latter was specifically mentioned in the standing stipulation. Moreover, intervention under 11 U.S.C. § 1109(b) was not warranted because there were no extenuating circumstances that would permit it. As to the merits of the preference action, the district court held that as to Paribas-London there was no preference because the funds were “earmarked” to repay Coral’s underlying debt and Coral had no control over their use. This appeal followed.
 

 Discussion
 

 I. Voidable Preferences
 

 Summary judgment is appropriate in the district court if the record discloses “that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.” Fed.
 
 *1355
 
 R.Civ.P. 56(c). On review we apply the same standard.
 
 See, e.g., Simon v. United States,
 
 711 F.2d 740, 743 (5th Cir.1983);
 
 Miles v. American Telephone & Telegraph, Inc.,
 
 703 F.2d 193, 194 (5th Cir.1985). The moving party carries the burden of demonstrating the absence of a material issue of fact, and therefore the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the opponent of the summary judgment motion.
 
 See, e.g.,Impossible Electronic Techniques, Inc. v. Wackenhut Protective Systems, Inc.,
 
 669 F.2d 1026 (5th Cir.1982);
 
 Joplin v. Bias,
 
 631 F.2d 1235, 1237 (5th Cir.1980). After reviewing the record and resolving all reasonable doubts in favor of the Committee, we determine that as a matter of law the $35,000,-000 repayment of Coral’s loan was not a preference under section 547 of the Bankruptcy Code as to either Paribas-Suisse or Paribas-London.
 
 [3]
 

 In general, a voidable preference under section 547 is a transfer by a debtor of his property to a creditor on account of an antecedent debt within ninety days of bankruptcy whereby the creditor receives more than he would have received had the debtor liquidated under chapter 7.
 
 [4]
 
 There is no dispute among the parties as to this maxim. We find that the drafters of the Bankruptcy Code made clear the purpose of section 547:
 

 “The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. The protection thus afforded the debtor often enables him to work his way out of a difficult financial situation through cooperation with all of his creditors. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally. The operation of the preference section to deter ‘the race of diligence’ of creditors to dismember the debtor before bankruptcy furthers the second goal of the preference section — that of equality of distribution.” H.R.Rep. No. 595, 95th Cong. 1st sess. 177-78 (1977), U.S.Code Cong. & Admin.News, 1978, 5787, 6138.
 

 For a preference to be voided under section 547, “it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminish
 
 *1356
 
 ed.”
 
 Genova v. Rivera Funeral Home (In re Castillo),
 
 39 Bankr. 45, 46 (Bankr.D.Colo.1984);
 
 see also LTD v. Scandore Paper Box Corp. (In re Lucasa International, Ltd.),
 
 13 B.R. 596 (Bankr.S.D.N.Y.1981);
 
 In re Moskowitz,
 
 13 Bankr. 357 (Bankr.S.D.N.Y.1981). If all that occurs in a “transfer” is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed. This type of transaction is referred to as “earmarking,” and is, according to a noted bankruptcy treatise, applicable in the following circumstances:
 

 “In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor’s assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly ‘earmarked.’ ” 4
 
 Collier on Bankruptcy
 
 11547.25 at 547-(101-102) (15th ed. 1986).
 

 The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor’s estate.
 
 See Castillo,
 
 39 Bankr. at 45;
 
 Schilling v. Electronic Realty Associates, Inc. (In re Hearn),
 
 49 Bankr. 143 (Bankr.W.D.Ky.1985);
 
 Hargadon v. Cove State Bank (In re daggers),
 
 48 Bankr. 33, 36-37 (Bankr.W.D.Tex.1985);
 
 see also Brown v. First National Bank of Little Rock, Arkansas,
 
 748 F.2d 490, 491 (8th Cir.1984) (citing 4
 
 Collier, supra,
 
 ¶ 547.25, stating “since the funds used to pay the note [third party’s were used] were not property of the debtor, there was no preferential transfer”);
 
 Kapela v. Newman,
 
 649 F.2d 887, 893 (1st Cir.1981) (in this preference case under the prior Bankruptcy Act, the court states, “The key question when assets are transferred so as to benefit a guarantor is whether those assets would ordinarily have been available to help satisfy the claims of other (general) creditors”).
 

 The district court held on the record before it that the earmarking doctrine applied and it denied the Committee’s preference claim because the $35,000,000 repayment of Coral’s loan was made by Leeward, a third party, and not Coral. Moreover, the district court held that
 
 at no time
 
 did Coral have general control over the funds whereby it could independently designate to whom the money would go. Further, the district court found that this money went to a specified creditor, Paribas-Suisse, who refunded to Paribas-London the $35,000,000 it had funded to Coral under interbank arrangements. The district court went on to state that while the
 
 form
 
 of the transfer might have indicated a payment from Leeward into Coral’s general account at Paribas-Suisse, there was no issue of material fact that the
 
 substance
 
 of this transfer was anything other than a payment by Leeward to “Paribas-Suisse and/or Paribas-London,” see note 1,
 
 supra,
 
 and that “[w]hat essentially occurred was a substitution of Leeward as a creditor for the creditor status of Paribas-Suisse.” Thus Coral did not “transfer” any property over which it had any control and therefore no preference resulted.
 

 After reviewing the evidence in the record in the light most favorable to the Committee, we determine that no genuine issue of material fact existed and that the district court’s characterization of this transaction is correct.
 

 The evidence established that from the very inception of this entire transaction, the $35,000,000 Leeward pledged to Pari-bas-Suisse was specifically intended to, and in fact did, constitute security for the $35,-000,000 loan from Paribas-Suisse to Coral, lian Hayim, vice president of Paribas-Suisse, testified in his deposition taken in
 
 *1357
 
 London, England by counsel for the Committee that:
 

 “The main communication regarding the pledge of this Leeward asset was made at the time that we did the loan whereby it was clearly understood that the loan we were granting to Coral was cash col-lateralised by the same amount of money which has been deposited with Leeward’s account with us.”
 

 Hayim further testified that:
 

 “Mr. Sudhaus told us that Coral wanted to borrow 35 million dollars and that this loan would be fully cash collateralised by 35 million dollars which would be put in the bank for the account of Leeward and that would be the main collateral, but, in addition to that, we would have some pledge of stocks. Obviously the bank initiated the operation when the 35 million dollars came in.
 

 [[Image here]]
 

 “The 35 million dollar deposit on Leeward was only there to collateralise the loan made to Coral, and the maturities on each interest period exactly matched on both sides. The idea was not only to collateralise the loan, but also to get the cheapest money possible, considering the cash which was deposited in the bank.”
 

 Moreover, William S. Sudhaus, president of Coral, testified in his deposition taken by counsel for the Committee that: “Before they would fund the loan, before they would make the loan to the company, it was necessary that $35 million be placed on deposit with Paribas Suisse or an affiliate.” He further testified that:
 

 “Q. [Counsel for the Committee]. Prior to January of 1983 [the date of the written pledge] was the $35 million deposit in any way formally pledged to Paribas Suisse?
 

 “A. [Sudhaus]. My recollection was, yes.
 

 “Q. What are you basing that recollection on?
 

 “A. On the fact that in discussions with Paribas Suisse prior to the funding of the loan in August of 1982 that we agreed not only to pledge a percentage of the stock of certain of the offshore subsidiaries, but we also agreed to maintain on deposit with Paribas Suisse or an affiliate $35 million which would be pledged to Paribas Suisse.”
 

 Thus the pledge was initially made by Leeward to secure Paribas-Suisse’s loan to Coral, and neither Coral nor Leeward had any power to disrupt this purpose. The Committee presented no evidence to dispute or challenge in any way the initial purpose of the pledge or to indicate in any way that this purpose changed as events progressed.
 

 Although the $35,000,000 pledge was not in the first instance in writing, there is no claim that it was invalid as between the parties (Leeward and Paribas-Suisse) on this account, and the evidence showed, without contradiction, that it was valid under Swiss law.
 
 [5]
 
 The $35,000,000 pledge is the same amount as Coral’s outstanding loan to Paribas-Suisse, and was sufficient to completely secure the loan. Leeward and Paribas-Suisse later signed a written “General Form of Pledge” on January 14, 1983, whereby Leeward granted Paribas-Suisse a right of pledge and set off on all of its assets and account balance on deposit .at Paribas-Suisse for the repayment of Coral’s loan.
 
 [6]
 
 The validity of this agreement—
 
 *1358
 
 at least as between Leeward and Paribas-Suisse — is likewise not questioned. Thus the record contains deposition testimony from Coral and Paribas-Suisse employees and a written pledge agreement that specifically tied the $35,000,000 cash deposit of Leeward to Coral’s underlying debt to Pari-bas-Suisse, and this evidence also established that the deposit was to be used specifically for this purpose. There is no contrary evidence.
 

 However, the key to the resolution of this dispute centers on whether Coral had any control of the Leeward collateral during the repayment of Coral’s loan when the preference allegedly occurred. The evidence established that in May 1983, Coral’s president Sudhaus determined that it was no longer financially advisable for Coral to continue paying interest on the loan.
 
 [7]
 
 He called Hayim at Paribas-Suisse and informed him that Coral “would prepay the indebtedness based on the liquidation of the deposit controlled by the bank” subject to Paribas-Suisse’s agreement not to collect any penalties for liquidation of Leeward’s deposit before its stated maturity date. Hayim agreed to forego any interest penalties for breaking the time deposit, and Su-dhaus stated that he would get the appropriate instructions from Leeward and Coral. The following telexes were then sent authorizing and directing repayment of the Coral loan to Paribas-Suisse with the Leeward collateral,
 

 1.May 9, 1983, 22:46 hours, Leeward to Paribas-Suisse, Nassau — “Please accept this as our authority to break our USDLRS 35 million deposit (scheduled to mature 29 July 1983) value 11 May, 1983 [the London fiduciary deposit] and transfer the principal and interest proceeds to our account No. 230900 at Paribas, Geneva.” By this telex Leeward directed Paribas-Suisse to transfer the $35,000,000 balance in the London fiduciary account in Paribas-Suisse’s name to Leeward’s account at Paribas-Suisse in Geneva.
 

 2. May 9, 1983, 22:49 hours, Leeward to Paribas-Suisse, Geneva — “Please accept this as our authority to transfer USD 35 million (U.S. dollars thirty five million) value 11 May 1983 from our A/C 230900 with yourselves to Coral Petroleum Inc’s A/C at same.” By this telex Leeward directed Paribas-Suisse that $35,000,000 be transferred from the Leeward account at Paribas-Suisse in Geneva to the Coral account at Paribas-Suisse in Geneva.
 

 3. May 9,1983, 23:17 hours, Coral to Pari-bas-Suisse, Geneva — “We are anticipating a transfer of funds to be credited to our account value May 11, 1983 in an amount of 35,000,000. Please debit the account of Coral Petroleum, Inc., value May 11, 1983, in the amount of 35,118,125, representing 35,000,000 in principal and 118,125 in interest, and prepay our term loan which is now scheduled to mature on July 29, 1983. Interest in the amount of 118,125 will be transferred to our account value May 11, 1983.”
 
 [8]
 
 By this telex Coral directed Pari-bas-Suisse that the $35,000,000 expected to be credited to its account at Paribas-Suisse in Geneva was to be applied by Paribas-Suisse in Geneva to repayment of Coral’s loan debt to it.
 

 Only after receiving all these instructions did Paribas-Suisse consummate the repayment of Coral’s loan with the Leeward deposit. On May 10, 1983, Paribas-Suisse simultaneously credited and debited both Leeward’s and Coral’s accounts at Paribas-Suisse in Geneva to repay the loan. Finally, on May 10, 1983, Paribas-Suisse telexed Paribas-London in order to repay the $35,000,000 that Paribas-London had
 
 *1359
 
 advanced for Paribas-Suisse to fund the Coral loan.
 

 The Committee claims that when the deposit was placed into Coral’s general account at Paribas-Suisse on May 10, Coral theoretically had general control over these funds for at least one “magic moment.” The Committee asserts that at this magic moment, Coral could theoretically have made payments to its general creditors (although it did not do so or attempt to do so). Hence, the Committee argues, there was a preference. The Committee claims that the only instructions to be considered in connection with the repayment transaction are the Leeward telexes which do not on their face restrict the Leeward collateral once it is placed in Coral’s account solely to the repayment of Coral’s obligation, and that, therefore, there were no restrictions upon Coral other than an “understanding that funds will be used in certain manner.” The Committee cites
 
 Smyth v. Kaufman,
 
 114 F.2d 40 (2d Cir.1940), a case decided under the prior Bankruptcy Act which discussed the earmarking doctrine, for the proposition that the existence of general control by a creditor over loan proceeds from a third party is a preference, even if the third party advancing the loan knew that the loan would be applied to a certain debt, for mere understandings will not suffice.
 
 See also Plotkin v. Sunflower Beef Packers, Inc. (In re Hudson Valley Quality Meats, Inc.),
 
 29 Bankr. 67 (Bankr.N.D.N.Y.1982). Thus the Committee claims that if the funds are “uncontrolled” or restricted only by an “understanding,” the earmarking doctrine does not exempt the transaction from being characterized as a voidable preference.
 
 [9]
 

 While it is true that the Leeward telexes themselves do not indicate that the Leeward deposit which was transferred into Coral’s “general account” was subject to any restrictions, we agree with the district court’s conclusion that to hold Coral had general control over these funds would be to entirely elevate form over substance.
 

 The Leeward collateral was at all times restricted for the security and the eventual repayment of Coral’s loan. The evidence also established that at all relevant times Paribas-Suisse maintained full control over the $35,000,000 collateral and excluded any control whatever of these funds by Coral. Sudhaus testified at his deposition that;
 

 “A [Sudhaus]. This deposit, this $35 million deposit was really outside of the control of the company [Coral]. The company
 
 had no other alternative
 
 but to either maintain the loan and the deposit and pay $1,000 a day or to repay the loan in utilizing the deposit and eliminate the expense. There wasn’t any other alternative.
 

 “Q [Counsel for the Committee]. What restrictions were there on the movement or the use of the $35 million deposit on either Leeward or Coral?
 

 “A.
 
 We could not move the $35 million deposit or utilize any proceeds thereof in any way but to pay down the outstanding loan due Coral.”
 
 (emphasis added).
 

 Thus from the very inception of the loan, once the Leeward collateral was placed in Paribas-Suisse’s hands, neither Coral nor
 
 *1360
 
 Leeward had any control over the funds whatever. Paribas-Suisse allowed neither Coral nor Leeward any powers of disposition over this account except to pay the debt. Hayim, vice president of Paribas-Suisse, stated in his deposition:
 

 “Q [Counsel for the Committee]. Who had the possession of control of those funds after they were deposited at Pari-bas Suisse Nassau up until the time in May 1983 when they were used to repay the loan?
 

 “A [Hayim]. We were in full possession and control of the money from the beginning to the end. At no time have we lost this control.”
 

 Hayim stated in a declaration taken under oath that: “Paribas Suisse would not have debited the $35,000,000 from Leeward’s account and credited that sum to Coral’s Current Account, with the same value date, except to specifically repay the obligations owing on the Term Note.” At and before the telexes and repayment, the $35,000,000 Leeward account was pledged to Paribas-Suisse and was under its lawful, actual control as security for the Coral loan.
 

 We also note that the Committee bases its claim on a factual misunderstanding. The Committee claims that the Leeward collateral was placed into Coral’s general account without restrictions being imposed by Leeward on Coral’s use of the funds, and that this gave Coral some form of control over these funds.
 
 See Smyth, supra.
 
 However, the evidence shows that when these funds “went” into Coral’s account, no semblance of control went with them. Hayim explained that under the banking practices at Paribas-Suisse, the book entry into Coral’s account reflecting the loan payment gave no control to Coral over the Leeward collateral. He testified that there is one cash account, called the current account, from which interest is computed on the cash balance. Liabilities are entered into the current account whenever they become cash liabilities. The following exchange during Hayim’s deposition further explains this system:
 

 “Q. How is that [repayment of a loan obligation] reflected, if at all, on the current account of that customer?
 

 “A. Whenever there is a loan to a customer, it is reflected on the current account, if it is a cash loan or whenever it is cash, at the debit of the current account. Whenever the loan is forgiven, or whenever the loan is considered as lost, the entry is made to the credit of the current account for the purpose of balancing the debit which was existing at the beginning. The fact that an entry is made at the credit of the current account does not mean that the customer has received an equivalent amount.
 

 “Q. In the case you have described, would funds actually be placed in the customer’s account before the credit is made?
 

 “A. Absolutely not. Credit is made only for accounting purposes. It has nothing to do with the legal property of the customer. It is a pure accounting system which has to balance debits by credits and vice versa whenever it occurs.”
 

 The district court also had before it the declaration, taken under oath, of Phillippe Neyroud, a Swiss lawyer, who further substantiated Hayim’s testimony by describing the legal effect of such entries. After discussing the Swiss banking practices, Ney-roud stated:
 

 “For proper bookkeeping, the Banque had to reflect the debit and credit on Coral’s current account, or it would not appear that the Loan was repaid.... Because the funds were debited from Leeward’s account and credited to Coral’s account just for proper bookkeeping purposes, that does not indicate that the funds were ever within Coral’s control. Coral had no discretion to use these funds.”
 

 Here there was no magic moment — there were merely simultaneous bookkeeping entries reflecting the credit and debit to the Leeward account and to the Coral account. The Coral account was credited and debited at the same time. When the telexes were
 
 *1361
 
 received, Paribas-Suisse already had, and continued to have, actual and lawful control over the Leeward account, pledged to secure the Coral loan. No transfers or book entries were made until all the telexes were received, and Paribas-Suisse thus had, before any entry was made to show a credit to the Coral account, the full power and right to apply the funds in the Leeward account to the Coral loan, and it continued to have such right and power until those funds were so applied. The funds were at all times under Paribas-Suisse’s lawful control. No evidence was presented by the Committee that Coral at any time had control over these funds, even for a moment. Under Rule 56(e), “when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.” The Committee’s unsupported speculation that Coral had control over the funds for some brief time does not meet the requirements of Rule 56(e) in the face of uncontro-verted evidence that Paribas-Suisse always had full control.
 

 The Committee further argues that there was no proof that Leeward, the third party, intended to restrict the use of the funds by Coral, and it relies on
 
 Telephone Stores of America, Inc. v. Banquest National Bank of Albuquerque (In re Telephone Stores of America, Inc.)
 
 54 Bankr. 25, 26 (Bankr.N.M.1985), for the proposition that
 

 “the crux of this case is Mr. Grady’s [the third party] intent when he signed the check over to TSA [the debtor]. If, in his mind, the money was to flow through TSA to pay the bank, then the transfer of the money would not be a preferential transfer. However, if Mr. Grady gave the money to TSA with no strings attached, then it would be a preferential transfer.”
 

 Since there was no evidence that Leeward, as opposed to Paribas-Suisse or Coral, intended to restrict these funds, the Committee claims that the transaction is a preference. The Committee also claims that under
 
 Coleman American Moving Services, Inc. v. First Natl. Bank and Trust Co. of Kearney (In re American Properties, Inc.)
 
 14 Bankr. 637, 641 (Bankr.Kan.1981), only third parties, not the creditors holding the debt, can restrict the use of the funds for purposes of determining the applicability of the earmarking doctrine, because the doctrine is not available when a creditor merely transfers money through the debtor for repayment to itself.
 

 We are not persuaded. As to the Committee’s claim concerning the lack of proof as to Leeward’s intent, we find that the decisions concerned with proof of the third party’s intent were rendered in cases presenting an entirely different situation than that presented here. In
 
 Telephone Stores,
 
 for instance, the payment was by the third party to the debtor, and then from the debtor to the creditor, under circumstances such that the intent of the third party was the only possible source of any restriction on the funds in the debtor’s hands. Here, however, as established above, Coral never had access to these funds because of the simultaneous bookkeeping transaction, and Leeward’s intentions were not the only available source of restriction on Coral’s use of the funds. Where the debtor physically receives control of the funds, there can still be an “earmark,”
 
 see
 
 4
 
 Collier, supra,
 
 11547.25, but the debtor’s lack of dispositive control must be proven. Demonstrating the third party’s-intent is one way of doing this, but we do not believe it is the exclusive method, especially if there is adequate proof of the lack of control by a debtor. Coral never had actual access to the funds. Consequently, we find the necessity of proving third party intent much less compelling. Although the earmarking doctrine does not explicitly distinguish between a situation where a third party pays money to a debtor to pay a creditor from a situation where the third party directly pays the creditor,
 
 see
 
 4
 
 Collier, supra,
 
 ¶ 547.25, we note that in a situation where a debtor never physically controls or owns the disputed funds, a
 
 *1362
 
 preference is much less likely to arise.
 
 See Stonitsch v. Wood & Huston Bank (In re Borgman),
 
 48 Bankr. 666, 667 (Bankr.W.D.Mo.1985) (“In the case at bar, a third party, the debtor’s mother-in-law, supplied the money to pay a specific creditor. The Court would be more comfortable if the mother-in-law had paid the money directly to the creditor.”). Furthermore, we note that were we to require that Leeward’s intent be proven, the evidence adequately establishes it. This evidence includes testimony that the $35,000,000 was to be used exclusively to repay the loan and other testimony that the sole purpose of Leeward’s deposit and involvement was to secure Coral’s loan. Further, there is the written pledge agreement which Leeward signed with Paribas-Suisse. We also note that Sudhaus was an officer of Leeward. There is no evidence indicating an absence of such intent or a contrary intent on Leeward's part respecting the $35,000,000.
 
 [10]
 

 We likewise reject the Committee’s claim that under
 
 American Properties,
 
 only Leeward, a third party, could restrict the collateral. The Committee argues that any restrictions here came from Paribas-Suisse, and not Leeward, and thus the earmarking doctrine is not applicable. However, the crucial fact is that Coral did not control the money to the extent that it became property of its estate. Paribas-Suisse’s control of the use of Leeward’s collateral would not constitute a preference because to look at the identity of the actual earmarker is to lose sight of the fact that whoever it was, it was not Coral.
 
 [11]
 
 This transaction is not a preference as to either Paribas-Suisse or Paribas-London, for the evidence conclusively establishes that Coral did not control the Leeward deposit to the extent necessary to classify it as Coral’s property subject to its power of disposition. It was Paribas-Suisse who exerted control, with Leeward, over these funds, not Coral.
 
 [12]
 

 11. The Committee’s Standing
 

 We find that the district court erred in its grant of summary judgment for Pari-bas-Suisse on the ground that the Committee lacked sufficient standing to sue it. The district court held that the January and April 1983 stipulations reached by Coral and the Committee granting the right to
 
 *1363
 
 sue various creditors to the Committee were not effective to confer standing upon the Committee to sue Paribas-Suisse because these stipulations specifically covered only Paribas-London. The district court further held that section 1109(b) of the Bankruptcy Code governing the intervention rights of a creditors’ committee was not available to confer standing upon the Committee to sue Paribas-Suisse because there were no “extenuating circumstances.”
 
 See Unsecured Noteholders Committee v. First National Bank and Trust Company of Oklahoma City (In re Amarex, Inc.),
 
 36 Bankr. 59 (Bankr.W.D.Ok.1984).
 

 We first note that the district court appears to have mistaken the January 1985 stipulation, which granted standing for the Committee to sue only Paribas-London, with the subsequent April stipulation, the terms of which are not explicitly limited to Paribas-London and, in fact, are quite broad in terms of the Committee’s standing to sue.
 
 [13]
 
 We believe the district court confused these two stipulations because in our reading of the April stipulation we find no restriction on its face other than the one requisite that Coral failed to sue a creditor by April 1, 1985.
 

 Second, even were we to hold that Coral had not consented to the Committee’s bringing suit, we would nevertheless conclude that standing should have been granted. Section 1109(b) of the Bankruptcy Code provides that a creditors’ committee “may raise and appear and may be heard on any issue under this chapter.” We had recent occasion to address the intervention rights of the creditors’ committee in
 
 Fuel Oil Supply and Terminating Co. v. Gulf Oil Corp.,
 
 762 F.2d 1283 (5th Cir.1985), where we held that section 1109(b) does not create an automatic right to intervention; rather, it places intervention under the Bankruptcy Code on the same footing as Fed.R.Civ.P. 24(a)(2), which allows intervention when a party with an interest in the proceeding would have its rights impaired if it were not allowed to intervene and those rights are not protected by the parties in the suit. In
 
 Fuel Oil,
 
 we further held that the intervention rights under section 1109(b) are quite broad in keeping with the policies of the Bankruptcy Code and the prior Bankruptcy Act.
 
 Id.
 
 at 1286 (“Congress intended § 1109(b) to carry forward to the Bankruptcy Code the broad rights to appear and be heard under the former Bankruptcy Code.”). We also noted, however, that the right to intervene was not absolute because the bankruptcy court can stop redundant cases where the claimants’ interests are already protected under the existing litigation.
 
 Id.
 
 at 1287. We expressly stated in
 
 Fuel Oil
 
 that bankruptcy cases concerning the right to initiate proceedings by a creditors’ committee are analogous to intervention cases because courts in deciding these cases use the Fed.R.Civ.P. 24(a)(2) analysis. Here, Coral refused to sue, yet the Committee desired to bring an action. If a preference were to exist, then under section 547 the unsecured creditors’ interests (which the Committee represents) are not protected.
 
 See. 5 Collier, supra,
 
 If 1109.-02(3) (a general right to be heard would be an empty grant unless those who had such right were allowed to act when those who should act did not). Thus we find that intervention should have been allowed.
 
 [14]
 
 However, because of our determination that no preference existed, we determine that this suit was properly dismissed.
 

 
 *1364
 
 Conclusion
 

 Having reviewed the record in the light most favorable to the Committee, we find that no genuine issue of material fact exists which would entitle the Committee to void the repayment of the Coral loan as a perference under section 547 as to either Paribas-Suisse or Paribas-London. Accordingly, we affirm the judgment of the district court.
 

 AFFIRMED.
 

 [1]
 

 . The bankruptcy court, in hearings on whether,
 
 inter alia,
 
 to give a general release to Paribas-Suisse in portions of the Coral chapter 11 proceedings not embraced in this appeal, stated that Paribas-London was the actual loan creditor. The district court in the present dispute (which is not an appeal of the bankruptcy court release ruling) recited in its statement of the facts that Paribas-Suisse, not Paribas-London, was the actual creditor. We find that the un-controverted evidence here established that Par-ibas-Suisse was the actual creditor in the Coral loan transaction and that Paribas-London merely funded the transaction on behalf of Paribas-Suisse. Although there is a “guarantee” from Paribas-Suisse to Paribas-London, this was merely Paribas-Suisse's undertaking to repay Paribas-London the sums it had advanced to Coral on behalf of Paribas-Suisse. Coral’s note was never assigned to Paribas-London. Paribas-Suisse clearly carried the risk of default by Coral and was the creditor to be repaid by Coral. Paribas-London was not Coral’s creditor. The resolution of this dispute does not, however, ultimately affect the outcome of this case.
 

 [2]
 

 . The "fiduciary deposit” here was a deposit made in the name of Paribas-Suisse but at the direction and risk of Leeward. This deposit was made at Paribas-London. Leeward earned the interest and shouldered the risk of the deposit. Paribas-Suisse earned a commission for its effort. This deposit was an interest-bearing deposit for a specific term.
 

 [3]
 

 . We are not bound in our review of a grant of a motion for summary judgment to the grounds articulated by the district court, for we may affirm the judgment on other appropriate grounds.
 
 See Davis v. Liberty Mutual Insurance Company,
 
 525 F.2d 1204, 1207 (5th Cir.1976) (‘In reviewing a district court’s grant of summary judgment, an appellate court may affirm even though the district court relied on the wrong reason in reaching its result.”);
 
 see also
 
 C. Wright, A. Miller, M. Kane,
 
 Federal Practice and Procedure: Civil
 
 § 2716 at 658 (1983); 6 (Part 2)
 
 Moore’s Federal Practice
 
 ¶ 56.27[1] at 56-1561 (2d ed. 1985). Thus although the district court decided against the Committee in its claim against Paribas-Suisse on standing (which we find to be erroneous, see Part II, infra), we affirm the judgment on the merits of the preference claim for which the same evidence was presented to the district court as to both Pari-bas-London and Paribas-Suisse.
 

 [4]
 

 . 11 U.S.C. § 547 provides, in pertinent part: "(b) Except as provided in subsection (c) of this section [concededly not applicable], the trustee may avoid any transfer of an interest of the debtor in property—
 

 "(1) to or for the benefit of a creditor;
 

 "(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 

 "(3) made while the debtor was insolvent;
 

 “(4) made—
 

 "(A) on or within 90 days before the date of the filing of the petition; or
 

 “(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
 

 “(5) that enables such creditor to receive more than such creditor would receive if—
 

 "(A) the case were a case under chapter 7 of this title;
 

 "(B) the transfer had not been made; and
 

 "(C) such creditor received payment of such debt to the extent provided by the provisions of this title."
 

 [5]
 

 . A Swiss lawyer in a declaration made under oath so stated.
 
 See
 
 Fed.R.Civ.P. 44.1.
 

 [6]
 

 . The "General Form of Pledge" provides, in pertinent part:
 

 “1. The undersigned Leeward Petroleum Company, Ltd. domiciled at Hamilton, Bermuda grant to the BANQUE DE PARIS ET DES PAYS-BAS (SUISSE) S.A. in —, hereinafter referred to as ‘the Bank', a right of pledge and of set-off on all their assets, properties, claims and balances deposited or to be deposited with ‘the Bank’ in their names or in its name with third parties, as security for any and all claims, present or future, that ‘the Bank’ has or could have
 
 against Coral Petroleum, Inc.
 

 "2. The undersigned recognize that the rights hereby granted to ‘the Bank’ concern all the above-mentioned assets, regardless of tiny particular administrative numerotation.
 

 "3. The undersigned authorize 'the Bank’ to realize and set-off the pledged assets, including any present or future rights in relation
 
 *1358
 
 therewith, such as interests, dividends, rights of subscription, etc.” (emphasis added).
 

 [7]
 

 . It appears that certain tax considerations that were thought relevant to the initial structure of this transaction were no longer vital considerations because of Coral’s losses (see note 10,
 
 infra
 
 ). Thus Coral was no longer worried about tax benefits and decided it was cheaper to pay off the loan and eliminate the debt service charges.
 

 [8]
 

 . The "value 11 May 1983” refers to the date the loan or deposit is valued at for purposes of computing interest, which is not necessarily the repayment date. Here the repayment date as reflected by the book entries at Paribas-Suisse was May 10, 1983.
 

 [9]
 

 .
 
 Smyth
 
 and its progeny do not represent as severe a limitation of the earmarking doctrine as the Committee intimates; rather, they attempt to define the amount of control necessary in a given instance to take the property out of the debtor’s estate for section 547 transfer purposes. Further, in articulating its rule for earmarking,
 
 Collier
 
 cites
 
 Smyth.
 
 4
 
 Collier, supra,
 
 ¶ 547.25 at 547-103. Other cases cited by the Committee are merely restatements of the
 
 Smyth
 
 line of decisions where the judicial inquiry focuses on the degree of control a debtor has over the disputed funds.
 
 See Jaggers,
 
 48 Bankr. at 36-37 (‘“The question ... is whether the funds of the third party were available for use by the debtor generally or were the funds solely available for the purpose of discharging a particular debt.”);
 
 Plotkin v. Sunflower Beef Packers, Inc. (In re Hudson Valley Quality Meats, Inc.),
 
 29 Bankr. 67, 78 (Bankr.N.D.N.Y.1982) ("If a creditor receives a transfer of property from the debtor which never became the debtor's property because it was ‘earmarked’ for or designated to go to such creditor by a third party, no question of a preference arises.”). Thus these cases do not define the law differently than we have stated above.
 

 [10]
 

 . The Committee urged at oral argument that Leeward and Coral would never have intended that the Leeward deposit be considered a pledge because of the adverse tax implications that would bring.
 
 See I.R.C.
 
 §§ 951, 956;
 
 Treas.Reg.
 
 1.956 — 2(b)( 1 )(iii) & -2(c)(2);
 
 see also Ludwig
 
 v.
 
 Commissioner,
 
 68 T.C. 979 (1977). Regardless of the theoretical validity of this argument as a matter of tax law, the issue of whether a pledge was "intended" is not open to dispute because the evidence conclusively establishes that by, at the latest, January 14, 1983, outside of the ninety-day preference period, Leeward and Paribas-Suisse signed a "General Form of Pledge”
 
 (see
 
 note 6,
 
 supra
 
 ) which pledged the Leeward collateral specifically and expressly to secure Coral’s obligations to Paribas-Suisse.
 

 [11]
 

 . The court in
 
 American Properties,
 
 14 Bankr. at 637, was faced with hard facts, and thus its holding may not be quite so broad as the Committee reads it. There an unsecured creditor orchestrated a complicated scheme to retire unsecured debt by the insolvent debtor and replace it with a secured debt of another debtor. The unsecured creditor, in essence, fronted its own cash to retire the unsecured debt and then attempted to label this "earmarking.”
 
 Id.
 
 at 639-41.
 

 [12]
 

 . The Committee makes an argument that the earmarking doctrine has been substantively invalidated or is at least severely restricted and not suitable for summary judgment. The Committee cites
 
 In re Villars,
 
 35 Bankr. 868, 872 (Bankr.W.D. Ohio 1983), as establishing that "earmarking” is not a magic word that validates preferences. The
 
 Villars
 
 court held that "both parties and
 
 Collier
 
 place undue emphasis on semantics as to whether the proceeds of the debtor’s operating loan were ‘earmarked.’ ” In
 
 Villars,
 
 the debtor was given a check from a bank payable to both the debtor and another creditor. The debtor endorsed the check over to the creditor and the court held that this was a preferential transfer because the debtor "had the absolute control over these funds in the sense that the Defendant had no legal right to force him to make an endorsement.”
 
 Id.
 
 But here, as in
 
 Castillo,
 
 39 Bankr. at 47, and unlike the debtor in
 
 Villars,
 
 "the debtor had no control over the use or disposition of funds." Further, in
 
 Villars,
 
 the court was faced with a much harsher situation than is presented here. There, an unsecured creditor caused a secured creditor to funnel funds through the debtor to retire the unsecured debt, while allowing the secured creditor to remain fully secure. Nothing comparable is alleged here.
 

 [13]
 

 . The Committee’s lawyer secured the signature, indicating agreement, of Coral's attorney to the following statement which was filed in the district court:
 

 "I have advised Judge McDonald that the clear intent of the Stipulation was to give the Creditors’ Committee standing to bring any preference action including the $35 million action against Paribas Suisse and Paribas London in the event that the Debtor chose, for any reason, not to bring such actions. If this corresponds with your understanding of the intent of the parties at the time of the Stipulation I would request that you so confirm by signing below and returning a copy of this letter to me.”
 

 [14]
 

 . We find the rule in
 
 Amarex
 
 to be too strict following our pronouncement in
 
 Fuel Oil