In re **PIONEER COMMERCIAL FUNDING CORPORATION (a/k/a PCFC of California), Debtor.**

**PIONEER COMMERCIAL FUNDING CORPORATION, Plaintiff,**

v.

**APPLE BANK FOR SAVINGS, Defendant.**

**Bankruptcy No. 90 B 20085.**

**No. 91 ADV. 6220.**

United States Bankruptcy Court, S.D. New York.

June 5, 1992.

See also, 124 B.R. 931, 114 B.R. 45.

Weil, Gotshal & Manges, New York City, for debtor, plaintiff.

Shea & Gould, New York City, for defendant.

---

## DECISION ON MOTION AND CROSS–MOTION FOR SUMMARY JUDGMENT

HOWARD SCHWARTZBERG, Bankruptcy Judge.

One day's difference will control the potential recovery of $2.5 million as a voidable preferential transfer. The motion and cross-motion for summary judgment in this action raise the issue as to whose money is paid when a debtor agent remits to its principal unsegregated funds which it previously collected from obligors of the principal.

Pioneer Commercial Funding Corporation ("Pioneer") is a Chapter 11 debtor in possession. On January 30, 1990, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed with this court by three creditors of Pioneer. The debtor then converted the case for relief under Chapter 11 of the Bankruptcy Code on April 20, 1990. By summons and complaint dated November 22, 1991, Pioneer commenced an adversary proceeding against Apple Bank for Savings ("Apple") seeking to recover pursuant to 11 U.S.C. § 547(b) claimed preferential transfers received by Apple in the sum of $2,524,982.00. After Apple filed its answer, Pioneer moved for summary judgment and Apple cross-moved for summary judgment.

### FACTUAL BACKGROUND

Pursuant to an Accounts Financing Security Agreement dated January 26, 1988 (the "AFSA") as amended, between Pioneer and WestAir Commuter Airlines, Inc. ("WestAir"), a subsidiary of WestAir Holding, Inc. ("WestAir Holding"), Pioneer agreed to make certain loans and advances to WestAir. Pursuant to the AFSA, as security for such loans and advances, WestAir granted Pioneer a security interest in certain accounts receivable of WestAir, and the proceeds thereof, arising from the transportation of freight and passengers. Pioneer then assigned all of its rights and interests in and to the Accounts Receivable to Security Pacific Bank ("Security Pacific"), as security for certain advances to be made by Security Pacific to Pioneer, which

funds Pioneer utilized, in part, to fund its advances to WestAir.

2. Pursuant to a Loan Agreement dated September 20, 1988 (the "Loan Agreement"), between Apple and WestAir, Apple agreed to make certain loans and advances to WestAir in amounts equal to 80% of certain of WestAir's accounts receivable. Under the terms of the Loan Agreement, the outstanding amount of any such loans or advances made to WestAir was not to exceed $2.5 million. Pursuant to the Loan Agreement, Apple appointed Pioneer as its exclusive agent to notify Apple of any requests made by WestAir for advances under the Loan Agreement. Additionally, under the Loan Agreement, WestAir's payment of all loans and advances was to be made to Pioneer for the account of Apple. The Agreement provided that until Pioneer remitted to Apple the funds which it collected, Pioneer was to hold all such payments in trust for Apple.

3. Additionally, Apple and WestAir entered into a Security Agreement dated September 20, 1988, whereby Apple was granted a security interest in certain of WestAir's accounts receivable.

4. Pursuant to an Intercreditor and Servicing Agreement dated September 20, 1988 between Pioneer and Apple, Apple Bank and Pioneer agreed that the respective security interests in and to the accounts receivable would be equal as to priority. Additionally, under the Intercreditor Agreement Apple appointed Pioneer as its agent to perform certain functions in connection with the Loan Agreement as follows:

> Apple Bank hereby appoints [Pioneer] as its agent to perform the following activities in connection with the [loans and advances] to WestAir and the payment of principal and interest thereon:
>
> > (a) [Pioneer] shall select the ... [Accounts Receivable] of WestAir on which [loans and advances] shall be made.
> >
> > (b) [Pioneer] shall supervise and be responsible for the collection of all [Accounts Receivable] on behalf of [Pioneer and Apple Bank], and the prompt remittance to Apple Bank of the amounts due to it from payments realized. Until remitted to Apple Bank, [Pioneer] agrees and undertakes to hold all such payments and recoveries in trust for Apple Bank.

5. After entering into, and pursuant to the terms of the AFSA, the Loan Agreement and the Intercreditor Agreement, Apple and Pioneer advanced sums to WestAir during the remainder of 1988 and part of 1989. Pursuant to the Intercreditor Agreement, Pioneer collected all monies due Pioneer and Apple Bank through the collection of proceeds of certain accounts receivable which were first processed through the Airlines Clearinghouse, Inc. ("ACH") and than transferred to Pioneer by ACH. ACH acts as a clearinghouse which settles accounts payable between participating airlines.

6. With the exception of a final advance in the approximate amount of $2.5 million, Pioneer, periodically remitted to Apple monies which satisfied the outstanding loans and advances due Apple under the Loan Agreement.

7. Pioneer did not establish a segregated account in which it deposited funds received from the ACH in satisfaction of WestAir's obligations. The ACH funds received by Pioneer were placed in Pioneer's general operating accounts. In turn, Apple's advances and loans to WestAir were repaid by Pioneer with funds maintained by Pioneer in various bank accounts. Apple was aware of this practice and did not object to it.

8. As of October of 1989, approximately $2.5 million was due and owing to Apple under the Loan Agreement as a result of monies it advanced to WestAir.

9. Pioneer maintains as agent for Apple it collected from ACH as the clearinghouse for WestAir sufficient funds from accounts receivable to repay the Apple claim of $2.5 million. Although not relevant to the controlling facts, Pioneer contends that certain third party entities converted Pioneer's funds and that Pioneer is currently engaged in litigation with these entities. In any event, to satisfy its obligation to remit to Apple the funds Pioneer collected from

ACH on behalf of WestAir, Pioneer proceeded to sell certain shares of the common stock of WestAir owned by Pioneer for $4.6 million. Pursuant to this sale, approximately $2.3 million was paid to First Interstate Bank of California which held a security interest in the WestAir stock as collateral for loans to Pioneer. The remaining $2.3 million in proceeds from the stock sale was wired by the Union Bank of Los Angeles (the "Union Bank") to the Pioneer account at Apple by two wire transfers dated October 31, 1989. Additionally, on October 31, 1989, Pioneer arranged for a third wire transfer of funds to the Pioneer account at Apple in the amount of $221,562.50. These funds were transferred from a Pioneer account at Citibank.

10. A letter dated October 31, 1989 from Union Bank to Apple, which confirmed the two wire transfers, said in relevant part as follows:

This will confirm on this day we have wired $2,303,420.44 to you for the credit of WestAir Commuter Airlines. This will consist of two wires, one of $1,000,-000.00 and one of $1,303,420.44.

11. Similarly, a second letter, dated October 31, 1989, which confirmed the third wire transfer in the sum of $221,562.50, was sent by Pioneer to Apple and said in relevant part as follows:

Please be advised that we have wired $221,562.50 from our account at CitiBank into our account no. 401-3139938.

This letter will serve as confirmation of our instructions dated October 31, 1989 to debit upon receipt of the wire, $221,-562.50 from our checking account and paydown the WestAir credit facility by the same amount.

12. In paragraph 5.1 of the October 30, 1989 Stock Sale Agreement between WestAir Holding and Pioneer, WestAir Holding acknowledged that it was still indebted to Apple and agreed "to discharge its indebtedness to Apple Bank as promptly as possible and in any event not later than November 1, 1989 (the 'Payment Date')." Thus, when Apple received the three wire transfers on October 31, 1989, in the sum of $2,524,982.94, which sums were deposited into Pioneer's account with Apple and thereafter credited by Apple as full payment of the WestAir loan, WestAir's loan obligation to Apple was then satisfied.

13. WestAir regarded these payments as having satisfied in full its obligation to Apple under their previous securing financing transaction. A letter from WestAir's counsel, dated October 30, 1989, reflects this position, which reads in relevant part as follows:

Pursuant to our conversation, please find enclosed herewith a Form UCC-2 termination statement. The enclosed is proposed to be filed in connection with WestAir's repayment *in full of its obligations to you.* Per our conversation, WestAir's California counsel or I will hold the termination statement in escrow pending your acknowledgment that you have been repaid in full.

If the enclosed meets with your approval, kindly sign but do not date the termination statement on behalf of Apple Bank as secured party and return it to my messenger who has been instructed to wait. (emphasis added)

14. On October 31, 1989, Apple deposited the payments totalling $2,524,982.94, into Pioneer's account as Apple's agent. As a result of internal operations, Apple did not credit Pioneer's checking account with the funds until November 1 and 3, 1989 to the extent of $2,525,022.94. These funds were then applied by Apple to reduce WestAir's indebtedness. According to Apple's records, the sum of $2.5 million was then credited to WestAir on November 3, 1989, effective as of November 1, 1989, in full payment of principle due under the WestAir loan. The sum of $24,756.94 was credited to WestAir by Apple on November 1, 1989 in payment of interest due under the WestAir loan.

## DISCUSSION

### *Summary Judgment*

Apple and Pioneer have moved and cross-moved for summary judgment under Federal Rule of Civil Procedure 56, which is made applicable to this adversary proceeding by Bankruptcy Rule 7056. In ruling on

a motion for summary judgment, the court must review the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, to determine if there is no genuine issue as to any material fact so that the moving party is entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 599, 106 S.Ct. 1348, 1362, 89 L.Ed.2d 538 (1986). The nonmoving party may oppose a summary judgment motion by making a showing that there is a genuine issue as to a material fact in support of a verdict for that party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

### Antecedent Debt

Pioneer, as a debtor in possession, may exercise the avoiding powers of a trustee in bankruptcy in accordance with 11 U.S.C. § 1107(a). Apple's basic response is that Pioneer collected the WestAir receivables as Apple's agent, holding them "in trust," so that the payments sought to be recovered from Apple as a voidable transfer were never the property of Pioneer, citing *Begier v. Internal Revenue Service*, 878 F.2d 762 (3d Cir.1989), *aff'd* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), and *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351 (5th Cir.1986).

The *Begier* case is not applicable to the instant case where Apple argues that common-law principles mandate the creation of a trust when Pioneer collected WestAir's receivables, even though the funds were not segregated as trust funds. The United States Supreme Court specifically explained that withholding taxes which are collected are *per se* statutory trust funds pursuant to 26 U.S.C. §§ 7501 and 7512, and therefore, differ from common-law trusts.

In the absence of specific statutory guidance on how we are to determine whether the assets transferred to the IRS were trust property, we might naturally begin with the common-law rules that have been created to answer such questions about other varieties of trusts. Unfortunately, such rules are of limited utility in the context of the trust created by § 7501. Under common-law principles, a trust is created *in property;* a trust therefore does not come into existence until the settlor identifies an ascertainable interest in property to be the trust res. G. Bogert, Law of Trusts and Trustees § 111 (rev 2d ed 1984); 1A W. Fratcher, Scott on Trusts § 76 (4th ed 1987). A § 7501 trust is radically different from the commonlaw paradigm, however. That provision states that "the *amount* of [trust-fund] tax … collected or withheld shall be held to be a special fund in trust for the United States." (Emphasis added.) Unlike a common-law trust, in which the settlor sets aside particular *property* as the trust res, § 7501 creates a trust in an abstract "amount"—a dollar *figure* not tied to any particular assets—rather than in the actual dollars withheld. Common-law tracing rules, designed for a system in which particular property is identified as the trust res, are thus unhelpful in this special context.

*Begier*, 496 U.S. at 61–63, 110 S.Ct. at 2264–65 (footnote omitted).

█ The *Coral Petroleum* case is similarly not applicable to the facts in this case. There, the court applied the so-called earmarking doctrine. The court pointed out that when the funds went into Coral's account, "no semblance of control went with them." *Coral*, 797 F.2d at 1360. Moreover, the *Coral* court said: "Here, … Coral never had access to these funds because of the simultaneous bookkeeping transaction…." *Id.* at 1361. Thus, the debtor in the *Coral* case never physically controlled nor owned the disputed funds. The key factor in applying the earmarking doctrine is the fact that "the assets from the third party were never in the control of the debtor and therefore payment of these

assets to a creditor in no way diminishes the debtor's estate." *Id.* at 1356 (citations omitted). The *Coral* court emphasized that not only did the debtor neither have control nor possession of the funds transferred by a book entry, but these funds would not be available to help satisfy the claims of their general unsecured creditors because the bank which held the deposited funds "excluded any control whatever of these funds by Coral." *Id.* at 1359. Under no circumstances could the deposited funds be available to the debtor's general unsecured creditors. As pointed out by the late Judge Learned Hand in *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70 (2d Cir. 1938), under the earmarking rule, funds advanced to a debtor by a third party and earmarked for a particular creditor do not belong to the debtor because the debtor does not control the funds and the debtor's estate is not diminished. *See also Smyth v. Kaufman*, 114 F.2d 40 (2d Cir.1940) (judicial inquiry focuses on the degree of control a debtor has over the disputed funds).

■ In the instant case, there is no dispute that the debtor had complete control over the funds which it collected from the WestAir receivables before it remitted them to Apple. The funds were not segregated and were deposited in Pioneer's general checking account where they were available to its unsecured creditors before it remitted the funds to Apple as Apple's agent under their Intercreditor Agreement.

When Pioneer, as agent for Apple, received payments from ACH on WestAir's receivables towards the payment of the Apple loan, it did not create an identifiable and segregated trust account which might be regarded as trust funds. Nor were the payments solely for the benefit of Apple and placed beyond the reach of Pioneer's creditors so as to comply with the earmarking doctrine. In short, as in the case of unrestricted bank accounts, a debtor-creditor relationship was created; Pioneer was obligated as a debtor to remit the funds to Apple, which could assert a claim against Pioneer for the proceeds received by Pio-

neer as Apple's agent. Pursuant to 11 U.S.C. § 101(10)(A), a "creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Therefore, when Pioneer caused the three wire payments to be paid to Apple in satisfaction of WestAir's loan obligation, it also satisfied its own coexisting antecedent debt to Apple.

### The 90 Day Rule

■ To constitute a voidable preferential transfer, the transfer must have been made "on or within 90 days before the date of the filing of the petition...." 11 U.S.C. § 547(b)(4)(A). A transfer is made "at the time such transfer takes effect between the transferor and the transferee...." 11 U.S.C. § 547(e)(2)(A).

When the $2.5 million was wired into Pioneer's account at Apple on behalf of WestAir on October 31, 1989, with instructions to credit the funds towards WestAir's obligation to Apple, the transfer to Apple was effected. Pioneer then had nothing further to do to complete the transfer. The fact that Apple chose to debit Pioneer's account on November 1 and 3, 1989, because the funds were wired in after 2:00 P.M. on October 31st does not detract from the fact that the transfer took effect between Pioneer and Apple on October 31, 1989. Apple's withdrawals of the funds from Pioneer's account with Apple on November 1 and 3, 1989 simply perfected its interest so that another contract creditor of Pioneer could not acquire a judicial lien against the funds that was superior to the interest of Apple, as transferee, as expressed in 11 U.S.C. § 547(e)(1)(B).[1] If Apple had failed to remove the wired funds from Pioneer's account within ten days following the transmission, October 31, 1989, the transfer would have been made at the time Apple removed the funds and thereby perfected its interest in those funds. 11 U.S.C. § 547(e)(2)(B). Under that set of facts, the transfer would not have been

---

1. For the purposes of this section—
    (B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a

judicial lien that is superior to the interest of the transferee.
11 U.S.C. § 547(e)(1)(B).

complete at the time it took effect between Pioneer as transferor, and Apple as transferee, as described in 11 U.S.C. § 547(e)(2)(A), but at the time the transfer was perfected as expressed in 11 U.S.C. § 547(e)(2)(B), which would have been more than ten days after the completed transfer between the parties and therefore within the 90–day period. The instant case does not present such facts.

Apple's citation of *Barnhill v. Johnson,* — U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) is unpersuasive. *Barnhill* held that a transfer of a check took effect when it was honored by the drawee bank, rather than when it was delivered to the payee. The delivery of a check is not an assignment of the funds on deposit with the drawee bank until the drawee bank honors the check and delivers the funds covered by the check. *Barnhill,* 112 S.Ct. at 1391.

On the other hand, when funds are wired in from one bank to another with instructions as to their application, the transfer is complete because the wired funds are no longer subject to the control of the transferor. Unlike the delivery of a check, where a bank must thereafter issue funds in order to honor the check, wire payments are the equivalent of honored funds and are deemed transferred when the recipient receives the electronic transmission. *Manufacturas International, LTDA v. Manufacturers Hanover Trust Co.,* 792 F.Supp. 180, 187–188 (E.D.N.Y.1992); *In re Allegheny, Inc.,* 86 B.R. 466, 471 (Bankr. W.D.Pa.1988). In *Manufacturas,* the court borrowed the following brief description of a wired funds transfer system from *Delbrueck & Co. v. Manufacturers Hanover Trust Co.,* 609 F.2d 1047, 1049 n. 1 (2d Cir.1979) (description reprinted from district court opinion, 464 F.Supp. 989, 992 n. 5 (S.D.N.Y.1979)):

> An electronic funds transfer begins with the sending bank. It normally receives a telex from the bank, individual, or corporate entity that is originating the transaction, instructing the sending bank to send funds. The sending bank tests and verifies the telex before transmitting the request, with all identifying information, from its local computer operator to a central computer network. The central computer for the transfer system stores the information and causes a sending message to be automatically printed at the sending bank.
>
> The sending bank, having determined that payment is appropriate, returns the sending message to its local computer operator to reinsert the message into the computer and press a release key. When the central computer receives this message, it causes the simultaneous printing of a debit ticket at the sending bank and a credit ticket at the receiving bank. The central computer creates a permanent record of the transaction and adjusts the accounts of the sending and receiving banks. These steps are almost instantaneous.
>
> Once the receiving bank has received the credit ticket, the individual or corporate beneficiary of the transfer is notified and the funds are made available to the recipient—generally the same day. *The funds transfer is considered completed at the moment the receiving bank receives the credit message, not when the beneficiary acquires the funds.*

*Manufacturas,* at 187 (emphasis added) (citations omitted).

In the instant case, the transfer of the wired funds on October 31, 1989 to Pioneer's account with Apple, accompanied by written instructions as to their application, resulted in a completed transfer to Apple on that Day. Accordingly, this transfer occurred on the 91st day before the date of the filing of the involuntary Chapter 7 petition on January 30, 1990. Hence, the 90–day rule has not been satisfied for purposes of 11 U.S.C. § 547(b), with the result that the transfer is not voidable, even if preferential.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(F).

2. There is no genuine issue as to any material fact in this adversary proceeding to recover a voidable preferential transfer pursuant to 11 U.S.C. § 547(b).

3. When Pioneer, as agent for Apple, wired in $2.5 million to Pioneer's account with Apple, together with instructions to apply the funds in satisfaction of WestAir's loan obligation, the transaction constituted a transfer of an interest of the debtor in property to or for the benefit of Apple, as a creditor, for or on account of an antecedent debt owed by Pioneer before such transfer was made, as expressed in 11 U.S.C. § 547(b).

4. The transfer of the $2.5 million wired into Pioneer's account with Apple on October 31, 1989, with instructions to apply the funds in payment of WestAir's loan obligation to Apple, constituted a completed transfer on October 31, 1989, despite the fact that Apple thereafter applied the funds on November 1 and 3, 1989.

5. The completed transfer of the wired funds on October 31, 1989 took effect 91 days before the filing of the involuntary Chapter 7 petition against Pioneer on January 30, 1990. Therefore, the transfer does not constitute a voidable preference within the meaning of 11 U.S.C. § 547(b).

6. Defendant Apple's motion for summary judgment dismissing the complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure as adopted by Rule 7056 of the Federal Rules of Bankruptcy Procedure is granted.

7. Plaintiff Pioneer's cross-motion for summary judgment on the theory of a voidable preferential transfer within the meaning of 11 U.S.C. § 547(b) is denied.

SETTLE ORDER on notice in accordance with the foregoing.