**In the Matter of OLIVER'S STORES, INC., Debtor.**

**Carmen J. MAGGIO, Trustee of Oliver's Stores, Inc., Plaintiff,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY, Defendant.**

**Bankruptcy No. 87–01226.**
**Adv. No. 88–0289.**

United States Bankruptcy Court, D. New Jersey.

Dec. 29, 1989.

Paul Kizel, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, Roseland, N.J., for plaintiff.

Kenneth S. Goodkind, Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein, Woodbridge, N.J., Jade Yellin and Melaney R. Gray, Simpson, Thacher & Bartlett, New York City (Richard A. Gerard, Vice President and Counsel, Mfrs. Hanover Trust Co., New York City, of counsel), for defendant.

## OPINION

WILLIAM F. TUOHEY, Bankruptcy Judge.

The matter before the court is an adversary proceeding initiated by Carmen J. Maggio, the plaintiff herein and trustee ("Trustee") of Oliver's Stores, Inc. ("Oliver's" or the "Debtor") to recover an alleged preferential transfer from the defendant, Manufacturers Hanover Trust Company ("MHT Co."), pursuant to 11 U.S.C. § 547(b) and § 550. The court possesses jurisdiction over this "core proceeding" pursuant to 28 U.S.C. § 157. Based upon a a joint stipulation of facts entered into by the parties, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The following findings of fact were agreed to by the parties in a formal written stipulation of facts filed August 18, 1989:

1. Manufacturers Hanover Trust Company ("MHT Co.") is a commercial bank. Since 1905 MHT Co. and its predecessors have lent funds to customers in the ordinary course of the bank's business.

2. Oliver's Stores, Inc. ("Oliver's"), which was known as Mandie Lynn, Inc. until 1985, was an expanding chain of discount retail stores engaged in the sale of children's and adults' clothing since 1983. Between 1983 and March 1987, Oliver's grew from a chain of two stores to one of 34 stores. In February 1986, Oliver's became a public company through an initial public offering of its stock at a price of $6.00 per share. The proceeds of the initial public offering amounted to $7,215,000.00.

3. Beginning in 1984 and continuing for approximately three years thereafter, MHT Co. provided Oliver's with a variety of loans and lines of credit. Prior to 1984 Oliver's had obtained credit from Valley National Bank and Midlantic National Bank/North ("Midlantic"). In addition to the credit facilities provided by MHT Co., the Franklin Corporation, another lender, provided unsecured financing subordinated to bank and trade debt.

4. At all times throughout the course of the banking relationship between MHT Co. and Oliver's, Oliver's, as is common for a company engaged in an expanding retail clothing business, required funds for operations and for growth. As a result, MHT Co. provided Oliver's with various credit facilities.

5. On March 5, 1987, Oliver's filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. Carmen J. Maggio was appointed the trustee of Oliver's on September 29, 1987 and com-

menced the above-captioned adversary proceeding on April 19, 1988. Subsequently, in June 1988, the bankruptcy action was converted to a chapter 7 proceeding. Mr. Maggio has continued to act as the trustee.

6. On or about April 11, 1984, MHT Co. replaced Valley National Bank as Oliver's lender, providing an initial line of credit (the "initial line") in the amount of $4,000,-000.00 to Oliver's. Prior thereto and as a condition of MHT Co.'s granting such line of credit, Oliver's obtained $1,250,000.00 in unsecured financing from the Franklin Corporation, of which amount fifty percent was subordinated to bank and trade debt. Joseph Wolfer ("Wolfer"), the chairman of the board and a co-founder of Oliver's, personally guaranteed the "initial line."

7. The $4,000,000.00 initial line, which was payable on demand, had a maturity date of June 30, 1985. MHT Co. renewed the initial line to June 30, 1986, and increased the line to $4,500,000.00 on or about July 23, 1985. Oliver's paid MHT Co.'s reference rate (the "reference rate") plus one percent as interest on the initial line. The initial line was fully repaid on February 19, 1986, the date on which Oliver's initial public offering was funded.

8. Subsequent to providing the initial line, MHT Co. made a term loan (the "initial term loan") to Oliver's in the amount of $2,000,000.00 on or about November 14, 1984, at an interest rate of the reference rate plus one and one-half percent. The initial term loan was to be paid over a period of four years with the last payment due on December 30, 1988. Oliver's made principal payments of $62,500.00 each on or about April 1, 1985, July 1, 1985 and September 30, 1985. In view of the imminent initial public offering of Oliver's stock, MHT Co. consented to Oliver's making the December 30, 1985 principal payment on the initial term loan on or about February 19, 1986, at which time Oliver's repaid the outstanding balance of $1,812,500.00 from the proceeds of the initial public offering. The initial term loan was personally guaranteed by Wolfer and Nadler.

9. MHT Co. also made a demand loan (the "demand loan") to Oliver's in the amount of $500,000.00 on or about January 13, 1986 at an interest rate of the reference rate plus three percent. As contemplated, Oliver's repaid this loan in full on or about February 19, 1986 from the proceeds of the initial public offering. This demand loan was personally guaranteed by Wolfer and Nadler.

10. Concurrent with the repayment of the initial line, initial term loan and demand loan, MHT Co. made a term loan to Oliver's in the amount of $3,500,000.00 at an interest rate of the reference rate plus one and one-half percent (the "new term loan"). The new term loan was to be repaid over a period of four years with the final payment due on December 31, 1986. The new term loan was not personally guaranteed by Wolfer or Nadler.

11. Subsequent to the initial public offering, MHT Co. also provided a $3,000,-000.00 line of credit to Oliver's on February 28, 1986 at an interest rate of the reference rate plus one percent (the "new line"). The new line was payable on demand and due to expire on March 2, 1987. The new line was not personally guaranteed by Wolfer or Nadler.

12. In late June or early July 1986, Oliver's requested additional credit from MHT Co. On July 28, 1986, MHT Co. provided to Oliver's a further $3,000,000.00 line of credit, which is the subject of this litigation ("the July 1986 line").

13. Pursuant to the terms of the promissory note evidencing the July 1986 line, full repayment of the July 1986 line was due on January 1, 1987. Because January 1, 1987 was New Year's Day and a legal holiday, applicable law provided that the July 1986 line became due on January 2, 1987, which was a Friday.

14. Oliver's paid interest at a rate of the reference rate plus one percent on the July 1986 line, the same rate paid on the initial line and new line.

15. Oliver's paid interest on the July 1986 line on a monthly basis, as it did on the initial line and new line.

16. The notes evidencing the initial line, new line and July 1986 line all contained identical events of default clauses.

17. The July 1986 line, like all of Oliver's other obligations to MHT Co., was unsecured.

18. The terms of the July 1986 line were similar to both the terms of MHT Co.'s other lines to Oliver's and the terms of other short term loans that MHT Co. regularly made in its banking business.

19. The note evidencing the July 1986 line was a standard note form used at MHT Co. for borrowers the size of Oliver's.

20. The terms of the July 1986 line and note evidencing that line of credit were similar to the terms used by other banking institutions with respect to lines of credit extended to other retailers the size of Oliver's.

21. Like the other credit facilities approved by MHT Co. for Oliver's after the initial public offering, the July 1986 line was not personally guaranteed by Wolfer or Nadler. Prior to extending the July 1986 line, Oliver's and MHT Co. verbally agreed that the July 1986 line would be extended beyond January 1, 1987 if Wolfer and Nadler guaranteed the obligation. Neither Wolfer nor Nadler ever guaranteed the July 1986 line, however.

22. At the time the July 1986 line was extended, MHT Co. considered it a temporary extension of credit that would be repaid from the proceeds of a secondary stock offering or a convertible subordinated private placement, along with funds generated by Oliver's year end cash flow. To the extent the July 1986 line was not repaid from cash flow, MHT Co. contemplated that it would be replaced by either equity financing, debt financing in the form of a private placement, or a long term loan.

23. At the time the July 1986 line was issued, MHT Co. considered Oliver's to have a promising future outlook.

24. At the time the July 1986 line was issued, Oliver's stock was trading at approximately $12.00.

25. In or about October 1986, Oliver's requested from MHT Co. a temporary increase in its line of credit in the amount of $2,500,000.00 to $3,000,000.00 for the purpose of financing additional store openings and building up holiday inventory. MHT Co. determined that it was not in its interest for it to extend Oliver's additional credit at that time and rejected this request. Until the rejection of this request, MHT Co. had not rejected any of Oliver's requests for credit.

26. By October 1986, Oliver's stock was trading at approximately $7.00. Average prices for stock of discount clothing retailers had fallen since July 1986.

27. In December 1986, MHT Co. was concerned about Oliver's ability to make timely repayment of the July 1986 line, and when Oliver's requested that MHT Co. extend the maturity date of the July 1986 line, MHT Co. declined. Thereafter, Oliver's indicated that it might seek additional financing from another bank in order to pay MHT Co.

28. In early 1984, prior to the time Oliver's began its banking relationship with MHT Co., Oliver's had obtained credit from Midlantic. Midlantic also had bid on the credit facility ultimately provided to Oliver's by MHT Co. in 1984. As of early November 1986, a $50,000.00 letter of credit from Midlantic to Oliver's was outstanding (the "Midlantic letter of credit").

29. In early November 1986, Oliver's approached Midlantic seeking additional credit. As a result, Midlantic approved a $3,000,000.00 loan for Oliver's in December 1986 (the "Midlantic loan").

30. Specifically, Midlantic extended $3,000,000.00 to Oliver's of which $50,-000.00 was used to satisfy the Midlantic letter of credit. The remaining $2,950,-000.00 was evidenced by a time note dated December 22, 1986 (the "time note"). The time note had a maturity date of March 23, 1987.

31. The time note was funded on December 22, 1986 when $2,950,000.00 was credited to Oliver's checking account number 132–01264–9 maintained at Midlantic. At the time the time note was funded, Midlantic and Oliver's contemplated that it

would be repaid from an offering of subordinated debentures.

32. From conversations with MHT Co. and Oliver's, Paula Mandell, the Midlantic loan officer who was primarily responsible for the Midlantic loan, was aware that an MHT Co. line was to become due in the near future, but she did not know exactly when any of the MHT Co. lines of credit were to mature.

33. Midlantic approved the Midlantic loan based on an express understanding that the proceeds would be utilized to reduce a line of credit with MHT Co. from $6,000,000.00 to $3,000,000.00.

34. Based on conversations with Wolfer, Mandell had no doubt whatsoever that Oliver's would use the funds to reduce a line of credit at MHT Co. by the amount of $3,000,000.00. Midlantic approved the Midlantic loan without placing any restrictions or conditions on the use of the proceeds. Subsequent to funding the loan on December 22, 1986, Midlantic did not take any action to restrict Oliver's use of the proceeds of the Midlantic loan.

35. Midlantic informed MHT Co. of the pendency of the Midlantic loan negotiations. However, MHT Co. had no agreement with Midlantic or Oliver's that the Midlantic loan would be used to repay the July 1986 line.

36. Between December 23, 1986 and January 5, 1987, Wolfer advised Mandell that he did not immediately pay MHT Co. the proceeds of the Midlantic loan because he was looking for some assurance from MHT Co. that MHT Co. would extend additional credit in the future if the line of credit was repaid.

37. On or about December 29, 1986, Oliver's issued a check in the amount of $2,949,000.00 from its Midlantic checking account number 132-01264-9, payable to Oliver's Stores, Inc., and deposited the proceeds of that check into Oliver's interest bearing investor savings account 131-01264-9 also maintained at Midlantic (the "investor account").

38. On Friday, January 2, 1987, MHT Co.'s headquarters office, where Oliver's accounts were administered, operated from 9:00 a.m. until 3:00 p.m. on a limited basis with a skeleton staff due to the fact that it was a holiday weekend. Joseph Powers, the MHT Co. vice president with primary responsibility for the Oliver's credit relationship, was vacationing in Connecticut on January 2, 1987.

39. Oliver's was also open for business on January 2, 1987, but operated with a skeleton staff since employees had the option of taking as a holiday either Friday, November 28, 1986 (the day after Thanksgiving) or Friday, January 2, 1987 (the day after New Year's Day). Stephen Lee, the financial vice president of Oliver's who served as a day-to-day contact with MHT Co., was vacationing in Florida on January 2, 1987. The parties have been unable to determine whether Nadler or Wolfer were present at Oliver's on January 2, 1987.

40. On January 2, 1987, MHT Co.'s New Jersey Division, which was the unit of MHT Co. involved in the relationship with Oliver's charged the account of one customer in the approximate amount of $1,000,000.00 in payment of an unsecured loan extended by MHT Co. to that customer.

41. At the start of the business day on January 5, 1987, approximately $4,000,000.00 was on hand in the investor account.

42. MHT Co. did not charge or attempt to charge any Oliver's account on January 2, 1987. On Monday, January 5, 1987, Midlantic wired $3,000,010.00 from the investor account to Oliver's operating account number 134-0-64624 at MHT Co. As authorized, MHT Co. then charged Oliver's operating account $3,000,000 in full repayment of the July 1986 line.

43. At no time on January 2, 1987 was the sum of $3,000,000 available in Oliver's operating account number 134-0-64624 or any other account maintained by Oliver's at MHT Co.

44. In the past, Oliver's operating account at MHT Co. had been charged for each payment of principal and interest made by Oliver's to MHT Co. for the various loans and lines of credit provided by

MHT Co. to Oliver's. Payment by charge to a customer's account is typical within the banking industry and is commonly the way in which retailers of the size of Oliver's repay bank debt.

45. MHT Co. did not charge Oliver's any penalty for its repayment of the July 1986 Line on January 5, 1987, and interest at the original borrowing rate of the reference rate plus one percent was paid by Oliver's through January 5, 1987.

46. When MHT Co. loans are due on the Friday following a major national holiday, such loans are often repaid on the following business day and no penalty is charged by MHT Co.

47. At the time the $3,000,000.00 payment in issue was made to MHT Co., Oliver's was "insolvent," as that phrase is used in 11 U.S.C. § 547(b)(3) and defined in 11 U.S.C. § 101(31).

48. The $3,000,000 payment enabled MHT Co. to receive more than it would receive if the above-captioned case were a case under chapter 7 of the Bankruptcy Code, the payment had not been made, and MHT Co. received payment of its debt to the extent provided by the provisions of the Bankruptcy Code.

49. The $3,000,000 payment was made according to "ordinary business terms," as that phrase is used in 11 U.S.C. § 547(c)(2)(C).

50. It is further stipulated and agreed by and among the parties, by their attorneys, that, notwithstanding the foregoing, MHT Co. in no way agrees that the $3,000,000 payment was a "transfer of an interest of the debtor in property," as that phrase is used in 11 U.S.C. § 547(b).

## CONCLUSIONS OF LAW

The plaintiff in the within action, the trustee, seeks to have a $3,000,000 payment from the debtor, Oliver's, to MHT Co. avoided as a preferential transfer pursuant to 11 U.S.C. § 547.[1]

Pursuant to § 547(g), the trustee has the burden of proving the five elements of a preference action under § 547(b). *See, In re Jefferson Mortgage Company*, 25 B.R. 963 (Bankr.D.N.J.1982); *In re Philadelphia Light Supply Company*, 33 B.R. 734 (Bankr.E.D.Pa.1983); *In re Sbraga*, 27 B.R. 199 (Bankr.M.D.Pa.1982). This includes the requirement that the payment in question be a "transfer of an interest of the debtor in property." 11 U.S.C. § 547(b); 11 U.S.C. § 547(g); *In re Belme*, 79 B.R. 355, 358 (Bankr.S.D. Ohio 1987); *In re H & A Const. Co.*, 65 B.R. 213, 214 (Bankr.D.Mass.1986).

The court finds that the five elements of an avoidable preferential transfer are present here, but there is one crucial requirement which must first be satisfied. The trustee must demonstrate that the $3,000,000 funded by Midlantic to Oliver's became "an interest of the debtor in property" as is contemplated by Section 547(b).

In determining whether the property or interest transferred belongs to the debtor, courts have considered whether the transfer diminished or depleted the debtor's assets generally available to unsecured creditors. *See, Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir.1986); *In re Sun Railings, Inc.*, 5 B.R. 538, 539 (Bankr.S.D.Fla.1980). The proposition that an estate is not diminished by transfers which do not deplete or diminish the estate has become known as the judicially created "earmarking doctrine."

---

1. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
        (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if—
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*See, In re Hartley,* 825 F.2d 1067, 1069 (6th Cir.1987). The earmarking doctrine has been commented upon by *Collier's on Bankruptcy* ¶ 547.03 at 547–26 (15th Ed.) as follows:

> In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never became part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor *with the understanding* that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are *clearly "earmarked".* (Emphasis added.)

The thrust of the trustee's argument against application of the earmarking doctrine is essentially twofold: first, the trustee alleges that the funding from Midlantic to Oliver's was not clearly earmarked to MHT Co. Secondly, the trustee asserts that the debtor retained custody and control over the Midlantic funds for fourteen days, violating the underlying principles of the doctrine.

■ The court finds that there is sufficient evidence to support a finding that the Midlantic loan was clearly earmarked to MHT Co. The stipulated record indicates that the Midlantic Loan was approved by Midlantic based upon an "express understanding" with Oliver's that the proceeds would be used to reduce a line of credit with MHT Co. by the amount of $3,000,000 in the near future. (See stipulation of facts, ¶¶ 32–34.)[2] This understanding was based upon conversations between Joseph Wolfer, the chairman of the board of Oliver's, and Paula Mandell, the Midlantic loan officer primarily responsible for the Midlantic loan to Oliver's. (*Id.* ¶¶ 6, 32–34.) The record also indicates that Mandell had "no doubt whatsoever that Oliver's would use the funds to reduce a line of credit at MHT Co. by the amount of $3,000,000." (*Id.* ¶ 34.)

All the preceding facts persuade the court that there was an express understanding, albeit verbal, between the parties, and that the Midlantic loan was, in fact, "earmarked" for repaying MHT Co. The trustee asserts that there was no agreement between Midlantic and Oliver's as to use of the Midlantic loan. (See plaintiff's trial brief, p. 32). In view of the facts cited *supra*, which were stipulated to by the parties, the trustee's argument fails.

The trustee properly cites *In re Bohlen Enterprises Ltd.,* 859 F.2d 561, 566 (8th Cir.1988) as the test many courts implement to determine whether or not the earmarking doctrine should be applied. The *Bohlen* Court summarized one of the alternative tests as follows:

> (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt,
>
> (2) performance of that agreement according to its terms, and
>
> (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.

*Bohlen* at 566.

Under this test, the court finds, through the stipulation of facts, that MHT Co. satisfied all tiers of the aforementioned test. Therefore, the court finds that the January 5, 1987 payment to MHT Co. by Oliver's did not diminish or deplete the debtor's estate because the Midlantic loan funds were directly "earmarked" for payment to MHT Co. *See, e.g., In re Hartley,* 825 F.2d at 1070; *Coral Petroleum, Inc.,* 797 F.2d at 1356; *Grubb v. General Contract Purchase Corp.,* 18 F.Supp. 680, 682 (S.D.N.Y. 1937), *aff'd,* 94 F.2d 70 (2nd Cir.1938). In essence, one creditor has stepped into the shoes of another and the estate has not been depleted or diminished.

---

**2.** The parties have also stipulated that Midlantic did not restrict Oliver's use of the Midlantic loan proceeds. Stipulation of facts ¶ 34. However, the court finds that, in light of the "express understanding" between Midlantic and Oliver's, the trustee must introduce other evidence to meet his burden of establishing that the Midlantic loan was not clearly earmarked, thus rendering the payment in issue a "transfer of an interest of the debtor in property ..." as required by 11 U.S.C. § 547(b). *See* 11 U.S.C. § 547(g).

The trustee's second assertion is that the debtor violated the underlying principles of the "earmarking doctrine" by retaining custody and control over the Midlantic loan proceeds from the period of December 22, 1986 through January 5, 1987. The trustee contends that the cases relied upon by MHT Co. emphasized that the extent of the debtor's control over the disputed funds in fact determines whether the transfer depletes the debtor's estate. *See, Coral Petroleum, Inc.,* 797 F.2d at 1356.

The court finds the trustee's position in this matter distinguishable under the attendant circumstances. The United States District Court for the District of New Jersey has upheld the earmarking defense where, as here, funds were advanced by a third party to the debtor rather than paid directly to the creditor. *See, In re Henry C. Reusch & Co.,* 44 F.Supp. 677, 680 (D.N.J.1942).[3]

The court finds that the debtor's holding of the Midlantic loan funds in the interest bearing checking account number 132–01264–9 at Midlantic for the fourteen day period, of which only six were accepted business days, was warranted under the circumstances and does not undermine MHT Co.'s position that the Midlantic loan was "earmarked." [4]

It has been stipulated between the parties that at the start of the business day of January 5, 1987, approximately $4,000,000.00 was on hand in Oliver's account number 132–01264–9, of which $3,000,000.00 was from the Midlantic loan proceeds. (Stipulation of facts, ¶ 41.) The court determines that the fact that the $3,000,000.00 loan was placed in Oliver's investor account at Midlantic with other funds does not by and of itself defeat the earmarking doctrine. It was still the "express understanding" between the parties

that the Midlantic loan proceeds would be used to repay the MHT Co. July 1986 line. Further, as noted in *Bohlen, supra,* Oliver's performed as represented and did, in fact, repay MHT Co.

Since the court finds that the Midlantic loan was "earmarked" for MHT Co., a preference action cannot be maintained by the plaintiff since there was no "transfer of an interest of the debtor in property" as is required by 11 U.S.C. § 547(b).

For the aforesaid reasons, judgment is entered in favor of defendant, Manufacturers Hanover Trust Co., and the within complaint is dismissed with prejudice and without costs.

---

**3.** While *In re Henry C. Reusch & Co.* was decided under the Bankruptcy Act, such cases are relevant in analyzing § 547 of the Bankruptcy Code. As noted by the Sixth Circuit in addressing the earmarking defense, because both statutes require that the property or interest in property transferred be the debtor's, "cases concerning that issue under the old Act are relevant to the new Code." *In re Hartley,* 825 F.2d 1067, 1070 n. 4 (6th Cir.1987).

**4.** The court finds persuasive the fact that the July, 1986 loan was not due until January 2, 1987. The fact that Oliver's was able to obtain financing from Midlantic to repay MHT Co. in advance should not deprive Oliver's from receiving the substantial interest on the funds for that period. The payment not being made on January 2 but on January 5, the next business day, appears to be warranted under the circumstances also, since January 2 was a holiday for many, including the major parties in both Oliver's and MHT Co. Stipulation of facts, ¶¶ 38–39.