In re KENOSHA LIQUIDATION COR-PORATION a/k/a and f/k/a Bear Construction Co., Inc., Debtor.

Michael F. DUBIS, Trustee, Plaintiff,

v.

HERITAGE BANK AND TRUST COMPANY, Defendant,

and

Stephen C. Mills and Guy D. Trecroci, Intervening Defendants.

Bankruptcy No. 91–00194.
Adv. No. 91–0115.

United States Bankruptcy Court,
E.D. Wisconsin.

Sept. 16, 1993.

Michael F. Dubis, Trustee.

James W. Hill, Racine, WI.

Joseph F. Madrigrano, Kenosha, WI.

### DECISION

DALE E. IHLENFELDT, Bankruptcy Judge.

The debtor filed a petition under chapter 7 of the Bankruptcy Code on January 11, 1991, and the plaintiff, Michael F. Dubis, was appointed trustee on the same date. On April 17, 1991, the trustee filed a complaint against Heritage Bank and Trust Company ("Heritage Bank") alleging that a preferential transfer had occurred. On May 16, 1991, Stephen C. Mills and Guy D. Trecroci, the sole directors and shareholders of the debtor, filed a motion to intervene as defendants, and also filed a proposed answer. The court granted their motion to intervene, and the trustee then filed an amended complaint. On June 4, 1992, a trial was held.

The trustee alleges that a payment made to Heritage Bank by the debtor in the amount of $113,895.36 is a voidable preference under the Bankruptcy Code. The defendants argue that the "earmarking" defense applies to this case and that therefore, the payment was not a "transfer of an interest of the debtor in property" under 11 U.S.C. § 547(b). The parties agree that the other elements of § 547(b) are present in this case, and that the sole issue before the court is whether the funds are property of the estate, or whether they fall under the "earmarking" exception to § 547(b).[1] Since the material facts are not

1. In their brief filed on June 30, 1992, after the trial was completed, the defendants raised another defense under § 547(c)(1), contending that the transaction was a substantially contem-

in dispute, the issue is one of law. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### FACTS

The debtor was incorporated in 1986 and was in the business of residential construction. Bear Realty of Kenosha, Inc. ("Bear Realty") was in the business of marketing the newly constructed homes. Mills and Trecroci were the sole directors and shareholders of both the debtor and Bear Realty. On February 24, 1987, Mills and Trecroci signed a "Continuing Guaranty (Unlimited)" in their individual capacities in order to allow the debtor to borrow from Heritage Bank (then known as American State Bank). On July 12, 1990, the debtor executed a renewal note to Heritage Bank in the principal amount of $113,646.57. Trecroci signed the note as president of the debtor, and Mills signed the note as vice-president. On that same date, Mills and Trecroci signed a "Collateral Pledge Agreement" in their individual capacities, pledging a certificate of deposit in the amount of $301,991.84 as security for the note.

According to Mills' testimony, he and Trecroci subsequently agreed to pay off the note because they "were both personally liable on this note." They asked Joseph Clark, the controller for Bear Realty, for advice as to the method of paying the note. He told them that in order to leave a clear record of the transactions for the possibility of a later audit by the taxing authorities, Mills and Trecroci should borrow the funds from Bear Realty, deposit the money into the debtor's account, and have the debtor write the check to Heritage Bank.

On July 20, 1990, Mills and Trecroci each borrowed $56,947.83 from Bear Realty and signed promissory notes in their individual capacities for the loans. On the same date, the debtor executed promissory notes to

Mills and Trecroci for $56,947.83 each. The notes were signed by Mills and Trecroci as officers of the debtor. These notes were unsecured. On July 19, 1990, Clark issued check # 3712 from the debtor payable to Heritage Bank in the amount of $113,895.36. The check was drawn on Kenosha Savings and Loan Association ("Kenosha S & L") and indicated that it was written in order to "pay off loan." It was signed by Trecroci. On July 20, 1990, check # 12740 was issued from Bear Realty to the debtor in the amount of $113,-895.66 ("Bear Realty check").[2] This check indicates that it was written as a "Business Note Payoff" and was signed by Mills.

On the morning of July 20, 1990, Clark had both of these checks in his possession. He gave Mills the check payable to Heritage Bank and a messenger the Bear Realty check to Kenosha S & L. Mills personally delivered his check to Frank Fuhrman at Heritage Bank and the messenger delivered the Bear Realty check to Kenosha S & L for deposit into the debtor's account. Delivery of the two checks was made on the same day and, for practical purposes, at the same time. Fuhrman deposited the debtor's check and stamped the note "paid." Kenosha S & L, however, failed to deposit the Bear Realty check. Instead, the check sat in an unopened package on a Kenosha S & L employee's desk for the next seven days and until January 27, 1990. In the meantime, on July 25, 1990, the Heritage Bank check was presented to Kenosha S & L for payment. Paul Gergen, president of Kenosha S & L, promptly called Mills to inform him that the debtor's account contained insufficient funds to cover the check. On July 26, 1990, Kenosha S & L returned the check stamped "non-payment phoned" to Heritage Bank. After Mills told Gergen that the Bear Realty check had been delivered to Kenosha S & L

---

poraneous exchange. The trustee responded that the court should not consider that defense in light of the pretrial stipulation that the only issue in dispute was whether the payment was "earmarked." In view of the stipulation of the parties, and its ruling regarding the "earmarking" defense, the court has not addressed the contemporaneous exchange defense.

**2.** A $.30 discrepancy exists between the amount borrowed by the debtor and the amount paid to Heritage Bank. No one provided an explanation for the difference.

on July 20, 1990, Kenosha S & L found the check on the employee's desk and on July 27, 1990, deposited the check into the debtor's account. The check payable to Heritage Bank was again presented for payment, and this check cleared the debtor's account on July 30, 1990. According to the debtor's Statement of Account at Kenosha S & L, on July 10, 1990, the debtor's balance was $712.12. On July 30, 1990, after the check payable to Heritage Bank cleared the debtor's account, the debtor's balance was $712.12.

In December, 1990, Mills and Trecroci repaid the loans from Bear Realty and received a release.[3] The debtor filed a petition under chapter 7 on January 11, 1991. On June 20, 1991, Mills and Trecroci filed a single claim in the bankruptcy case in the amount of $113,895.66.

Other than the notations on the two checks regarding the purpose of the funds, no written instructions existed as to the disposition of the funds that the debtor borrowed. Mills testified that the agreement between him and Trecroci to pay back the loan was verbal. Neither corporation (the debtor or Bear Realty) prepared any minutes or resolutions mentioning the use of the funds to pay off the note to Heritage Bank.

## DISCUSSION

In this action, the trustee seeks to have the $113,895.36 payment made by the debtor to Heritage Bank avoided as a preference under 11 U.S.C. § 547(b). Under § 547(g), the trustee has the burden of proving the elements under § 547(b), which includes demonstrating that the payment was a "transfer of an interest of the debtor in property." This requirement, stipulated by the parties as the sole issue in this case, is disputed by the defendants, who argue that the "earmarking doctrine" applies and that therefore, no preference has occurred.

■ As a preliminary matter, the trustee argues in his brief that the "earmarking

doctrine" does not exist under the Bankruptcy Code. In *Matter of Smith*, 966 F.2d 1527, 1533 (7th Cir.1992), which was decided after the trustee submitted his brief, the court recognized that bankruptcy courts use earmarking as an exception to § 547(b), but found it inapplicable to the facts of that case. The earmarking doctrine is "entirely a court-made interpretation of the statutory requirement that a voidable preference must involve a 'transfer of an interest of the debtor in property.'" *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 565 (8th Cir.1988). It is widely accepted as a defense against a preference action. *See, e.g., Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1356 (5th Cir. 1986) (citing cases); *In re Grabill Corp.*, 135 B.R. 101, 107 (Bankr.N.D.Ill.1991). This court rejects the trustee's argument and finds that the earmarking doctrine is a valid defense against a preference action.

■ The earmarking doctrine occurs when a new creditor provides funds to the debtor and specifies that those funds shall be used to pay an old creditor. If the effect of the "transfer" is merely that one creditor is substituted for another, then "no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed." *Coral Petroleum*, 797 F.2d at 1356. Although many courts have published decisions discussing the earmarking doctrine, the Eighth Circuit provides a concise yet detailed look at its origins in *Bohlen*, 859 F.2d at 565:

The earliest enunciation of the doctrine occurred in cases where the new creditor providing new funds to pay off the old creditor, was himself also obligated to pay that prior debt. In other words, the new creditor was a guarantor of the debtor's obligation, such as a surety, a subsequent endorser or a straight contractual guarantor. Where such a guarantor paid the debtor's obligation directly

---

3. The Bear Realty receipt and release acknowledging the payments of Mills and Trecroci is dated November 20, 1990. Clark testified that at a meeting in November, 1990, Mills and Tre-

croci indicated that Bear Realty would be paid right away. Clark prepared the receipt and held it, but did not change the date when he ultimately received the checks in December.

to the old creditor, the courts rejected the claim that such payment was a voidable preference. *See e.g. National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042 (1912). The holding rested on a finding that the new creditor's payment to the old creditor did not constitute a transfer of the debtor's property. The courts buttressed this conclusion with the rationale that no diminution of the debtor's estate had occurred since the new funds and new debt were equal to the preexisting debt and the amount available for general creditors thus remained the same as it was before the payment was made. A possible additional rationale may have been the view that such a result was needed to avoid unfairness and inequity to the new creditor. If his direct payment to the old creditor was voided, and the money was ordered placed in the bankruptcy estate, the new creditor, as guarantor, would have to pay a second time.

■ Some courts later extended the doctrine to cover not only payments made by the guarantor directly to the creditor, but also to payments made to the debtor with instructions to use the money to pay a particular creditor. *Id.* (citing *First Nat'l Bank of Danville v. Phalen,* 62 F.2d 21 (7th Cir.1932); *In re Reusch & Co.,* 44 F.Supp. 677 (D.N.J.1942)). Courts allowed the use of the doctrine in these instances even though the debtor had some control over the funds. The courts justified their results by stating that the debtor was holding the new funds "in trust" or in a "fiduciary capacity," that they would not let "form control over substance," or that the result involved "no diminution" of the debtor's estate. *Bohlen,* 859 F.2d at 565–66 (citing *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490, 492 n. 6 (8th Cir.1984)). For instance, in *First Nat'l Bank of Danville v. Phalen,* 62 F.2d at 23, the court cited *Keegan v. Hamilton Nat'l Bank,* 163 Ind. 216, 71 N.E. 647 (1904), for the proposition that:

> [t]he law has regard for substance, rather than 'shades or shadows,' and the mere fact that the money, under the circumstances, was credited to the company, did not make it the funds of the company, and liable to be distributed among its creditors in the event of its being adjudicated a bankrupt.

The next step in the development of the earmarking doctrine was to broaden it to cover non-guarantor situations, although the Eighth Circuit criticized that extension in *Bohlen.* 859 F.2d at 566; *see also In re International Club Enter., Inc.,* 109 B.R. 562, 567 (Bankr.R.I.1990); *In re Ludford Fruit Products, Inc.,* 99 B.R. 18, 21 (Bankr.C.D.Cal.1989). However, numerous other courts have reasoned that when a new creditor loans a debtor money in order for the debtor to repay the particular debt of an old creditor, and the debtor does not exercise any "dispositive control" over the funds, the earmarking doctrine should be applied to defeat a preference attack. *See, e.g., Coral Petroleum,* 797 F.2d at 1361–62; *In re Network 90°, Inc.,* 126 B.R. 990, 994 (N.D.Ill.1991); *Grabill,* 135 B.R. at 110. As *Collier's* explains:

> In cases in which a third person makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly "earmarked."

4 *Collier on Bankruptcy* ¶ 547.03, at 547–26–27 (15th ed. 1993).

In a recent Seventh Circuit case, the court referred to the earmarking doctrine as an exception to the "underlying principle" that a debtor's transfer of money borrowed from a third party is a transfer of the debtor's property under § 547(b). *Smith,* 966 F.2d at 1533–34 n. 9. The Seventh Circuit stated:

> [the earmarking] doctrine is applicable only where a third party lends money to

the debtor *for the specific purpose of paying a selected creditor* ... Such a transfer is said not to be a preferential transfer because (1) the debtor never exercises "control" over the new funds; and (2) the debtor's property (i.e., the fund out of which creditors can be paid) is not diminished.

*Id.* at 1533 (emphasis in original). In *Smith,* the "loan" that the bank made to the debtor arose when the bank provisionally credited the debtor's account after the debtor deposited a check that ultimately failed to clear. On the same day that the debtor deposited the check, he wrote a second check to a creditor, and the second check was honored by the bank before it discovered that the debtor's account contained insufficient funds. The court determined that earmarking was inapplicable: the bank did not condition the "loan" on paying off a particular creditor; the debtor exercised control over the funds by selecting the creditor whom he would pay; and the debtor's property was diminished. *Id.*

In *Smith,* the Seventh Circuit cited a case that is particularly relevant to the case at bar. In *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490 (8th Cir.1984), Ark–La Materials, Inc., the debtor corporation, executed a promissory note for $45,000 payable to First National Bank. George Locke, the chairman of the board at Ark–La, signed the note on behalf of the corporation, and also signed the note in his individual capacity along with two others (Fred Weaver and H. Allen Gibson), making all three personally liable on the note. The bank demanded payment from the three co-makers after Ark–La failed to pay when the note became due. Locke and Weaver presented the bank officer with three checks made payable to Ark–La, each in the amount of $15,427.19, in full payment of the note. Two checks were signed by Weaver and payable from accounts of other companies with which he was associated, and the third check was signed by Locke and payable from money he received as a personal loan from the bank. Locke and Weaver instructed the bank officer to use the checks to pay off the $45,000 note plus interest. The officer then told his secretary to type an endorsement on the backs of the checks which read "[f]or the credit to Ark–La Materials," and the note was paid in full.

After Ark–La filed a chapter 11 petition, the trustee sought to avoid the payments made by Locke and Weaver as preferences under § 547(b). The Eighth Circuit found that no diminution in the debtor's estate occurred because all of the money used to pay the note came from the individual co-makers. *Id.* at 491. The court found no evidence that the co-makers received any money or property from Ark–La in return for their payment of the note, indicating that the result may have been different if such evidence existed. *Id.* The court stated that the co-makers paid the note only to extinguish their personal liability. *Id.*

Significant to the case at bar is a footnote in *Brown,* where the Eighth Circuit stated:

The bankruptcy court appeared to imply that, had the co-makers paid the money into Ark–La's account and then drawn a check from that account to pay the Bank, a preference would have been created. We disagree. The mechanics of the transfer may not necessarily be determinative. The paramount consideration is whether there has been a diminution in the bankrupt's estate as a result of the transfer.

Where payment to a creditor is made by one liable as an indorser or guarantor, out of his own funds, the creditor has not received a preference from the insolvent debtor. It does not matter that in the course of the transaction the party secondarily liable may have paid the money to the debtor, to be given by him to the creditor, and the debtor may have turned it over to the creditor; for in such a case the debtor took the money charged with a fiduciary obligation to employ it toward extinguishment of the particular debt, and the money that the creditor received was never a general asset of the debtor. *Grubb v. General Contract Purchase Corp.,* 18 F.Supp. 680, 682 (S.D.N.Y.

1937) (citations omitted), aff'd, 94 F.2d 70 (2d Cir.1938). *Id.* at 492 n. 6.

In *Matter of Oliver's Stores, Inc.*, 112 B.R. 671, 678 (Bankr.N.J.1989), the chapter 11 trustee attacked a payment made to Manufacturers Hanover Trust Company ("MHT") as a preference, arguing that the earmarking doctrine was inapplicable because the debtor retained control over the funds in its account for 14 days. In July, 1986, MHT loaned the debtor $3,000,000, which was to be repaid on January 1, 1987.[4] In November, 1986, the debtor requested a loan from Midlantic National Bank/North ("Midlantic"), and on December 22, 1986, after approval of the loan, Midlantic credited $2,950,000 to the debtor's checking account at Midlantic. Although Midlantic approved the loan without any restrictions on its use, there was an express understanding between representatives of the debtor and Midlantic that the funds would be used to reduce the debtor's obligation to MHT.

On December 29, 1986, the debtor issued a check to itself in the amount of $2,949,000 from its Midlantic checking account, depositing the proceeds of the check into its interest bearing investor savings account at Midlantic. On January 5, 1987, Midlantic wired $3,000,010 from the debtor's investor savings account to the debtor's operating account at MHT, which then charged the account $3,000,000 in full repayment of the July 1986 loan. MHT did not attempt to charge the debtor's account on January 2, 1987, because MHT loans that were due on the Friday after a major national holiday were often repaid the following business day with no penalty to the borrower.

In holding that the $3,000,000 payment was not an avoidable preference, the court found that an express understanding, although verbal, existed between representatives of the debtor and Midlantic that the loan would be used to pay off the debt to MHT; that the funds were clearly "earmarked." *Id.* at 677. Secondly, although the funds were in the debtor's account for 14 days, of which only six were business days, the court held that the situation justified the delay in payment. *Id.* at 678. The loan was not due until January 2, 1987, and the court found that the debtor's ability to secure a loan from Midlantic before that time should not have deprived it from receiving interest on the funds between December 22, 1986, and January 2, 1987.[5] *Id.* at 678 n. 4. The fact that the payment was not made until January 5, 1987, was also warranted by the circumstances because January 2 fell on a Friday, and MHT's practice in those situations was to wait until the next business day to charge the account. *Id.* Finally, the court stated that placing the Midlantic loan money into the debtor's account containing other funds did not by itself defeat the earmarking doctrine, as it was expressly understood that the loan would be used to pay MHT, and ultimately, the debtor did in fact use the funds to repay MHT. *Id.* at 678.

After extensive review of the abundant case law on the earmarking doctrine, this court finds that the doctrine applies to the facts of this case. The payment from the debtor to Heritage Bank with funds loaned by Mills and Trecroci is not an avoidable preference as there was no "transfer of an interest of the debtor in property" as is required by 11 U.S.C. § 547(b).

The situation presents a classic example of one unsecured creditor (collectively, Mills and Trecroci),[6] who also happens to

---

**4.** The debt was not actually due for repayment until January 2, 1987, because of the holiday.

**5.** Between December 23, 1986, and January 5, 1987, Joseph Wolfer, the chairman of the board of the debtor corporation, informed MHT's representative that he did not immediately pay MHT the Midlantic loan proceeds because he wanted assurance from MHT that it would extend future credit to the debtor if the previous loan was repaid.

**6.** The parties dispute the actual identity of the new creditor. The trustee argues that it was Bear Realty because the funds loaned to the debtor to pay Heritage Bank were in the form of a check from Bear Realty. The defendants contend that the testimony and exhibits demonstrate that even though the check was written by Bear Realty, the source of the funds was, in fact, Mills and Trecroci. The court agrees with the defendants. Mills' testimony was that he and Trecroci borrowed the funds from Bear Realty.

be the guarantor on the note, being substituted for another unsecured creditor (Heritage Bank), with no diminution of the debtor's estate. If Mills and Trecroci had paid Heritage Bank directly in order to extinguish their personal liability on the note, they would then be able to pursue the debtor for reimbursement and clearly, no preference would have been created. Instead, they loaned the funds to the debtor, who then paid Heritage Bank, while they took promissory notes in return. The effect is the same. The debtor now owes Mills and Trecroci on the notes, but at the same time the bank's claim is extinguished. This substitution of creditors has neither improved nor impaired the situation for the other unsecured creditors. The earmarking doctrine was initially created to protect those who paid debts for which they were secondarily liable and was later extended to cover payments made by guarantors to the debtor with instructions to use the funds to pay the guaranteed obligation. This court's decision is consistent with one of the original principles behind the earmarking doctrine: to avoid the unfairness and inequity that would result if the guarantor were required to pay the debt twice. If the payment to the Bank were avoided as a preference, the Bank could pursue Mills and Trecroci under the guaranty, forcing them to repay a debt which they have already paid once before. *See In re Trinity Plastics, Inc.*, 138 B.R. 203, 207 (Bankr. S.D.Ohio 1992).

The court also finds that the doctrine is applicable because, although the debtor had some control over the disposition of the funds, they were clearly earmarked to pay Heritage Bank. Mills testified that he and Trecroci agreed to repay the note because they were "both personally liable" on it. When Mills approached Clark, the controller, with his intent to repay the note, it was Clark, not Mills or Trecroci, who suggested

the method used. The only reason that the funds were first routed to the debtor's account was to leave a clear trail of the origin and destination of the funds. Clark's trial testimony regarding the procedure was as follows:

Q Directing your attention to on or about July 19th, 1990, were you given any directions by either Mr. Mills or Mr. Trecroci with reference to the payment of a note which has been marked as Exhibit #1 in this trial?

A Yes.

Q What instructions were you given?

A Steve Mills informed me that he wanted to pay off a Bear Construction loan that they had with Heritage Bank. And he asked me what I thought would be the best way to handle this.

Q Is that because he was getting your advice as a controller, someone with an accounting background?

A Yes.

Q And what did you tell Mr. Mills?

A I informed Steve that we should—we should cut the check out of Bear Realty, Kenosha as a loan to Steve and Guy. And we should deposit the funds into Bear Construction and cut a check out of Bear Construction to Heritage Bank. My reasoning for depositing the funds in the Bear Construction was solely to leave a trail of the events that occurred.

Q In other words, if there were an audit by the IRS, or some other entity later on, there would be these checks and papers to document what happened?

A Yes.

Q Is that the only reason why it was done this way, as opposed to cutting a check directly to Heritage Bank from Bear Construction, or Bear Realty, I'm sorry?

Joe Clark, the controller, also testified that his advice to the two was to borrow the funds from Bear Realty. Mills and Trecroci both executed promissory notes to Bear Realty in the exact amount of the money owed to the Bank (½ each), and on the same day, the debtor executed promissory notes to Mills and Trecroci (not Bear Realty) for the exact amount owed to the

Bank (again, for ½ each). Mills and Trecroci later repaid their notes to Bear Realty, and it was Mills and Trecroci, not Bear Realty, who filed an unsecured claim against the debtor. Mills and Trecroci were the sources of the new funds, while Bear Realty, who wrote the check, was merely a conduit between the source and the debtor.

A   Yes.

Transcript, p. 7–8.

Although there was no corporate resolution or minutes regarding restrictions on the use of the funds, the check which was issued to the debtor in the amount of $113,-895.66, the same amount as that owed on the note, indicates that it was written as a "Business Note Payoff." There was an express understanding, although verbal, that the debtor would use the funds solely to repay the note at Heritage Bank. *See Oliver's Stores*, 112 B.R. at 677. Mills and Trecroci were the guarantors on the note, the source of the new funds, and the principals of the debtor. They had a compelling reason to pay off the note (to extinguish their personal liability), and although the debtor could have theoretically done something different with the money, the reality is that Mills and Trecroci, as the principals and guarantors, had control of the funds and could insure that they were used as intended. They had no reason and there is no evidence of any intent on their part other than to pay Heritage Bank. The court agrees with the defendants that if the funds are earmarked, the fact that the guarantors also control the debtor will not change the result. In considering the earmarking doctrine, this court is aware of no decision by any other court that has limited the application to non-insider guarantors. As the defendants correctly point out, guarantors of corporate notes usually exercise some degree of control over the corporation. *See Brown*, 748 F.2d 490 (chairman of the board signed note on behalf of corporation and in individual capacity). In *Oliver's Stores*, 112 B.R. at 678, the funds were placed in the debtor's general checking account, but the court found that that fact alone could not defeat application of the earmarking doctrine.

In the present case the debtor's checking account statement disclosed that on July 10, 1990, before the check to the debtor was presented for deposit, the account contained $712.12. On July 30, 1990, after the payment was made to Heritage Bank, the account again contained $712.12. Other than the transactions in question in this case, there was no other activity in this account during that period of time. No other checks were written nor deposits made.

Finally, although it is clear to the court that the funds were to be used to repay the Heritage Bank loan, an issue that remains to be addressed is the time period during which the funds sat in the debtor's general account. The record indicates that Mills and Trecroci were attempting to make a simultaneous transaction; to deposit the money into the debtor's account on July 20, 1990, while on the same day paying Heritage Bank with a check drawn on that account. Unfortunately for Mills and Trecroci, there was a three day delay between the time the Bear Realty check was deposited at Kenosha S & L and the time the debtor's check to Heritage Bank was paid by Kenosha S & L.

■ This court agrees with the Eighth Circuit in *Brown* that the "mechanics of the transfer may not necessarily be determinative." 748 F.2d at 492 n. 6. The debtor exercised no real control over the handling of the checks by Kenosha S & L. The three day lapse occurred through no fault or action on the part of Mills and Trecroci, the debtor, or Heritage Bank.

■ When the Bear Realty check was ultimately deposited on July 27, 1990, it was deposited for the specific purpose of covering the check payable to Heritage Bank, which had already been written and presented once for payment. According to Wisconsin law, "where there is a deposit in a bank for the purpose of meeting certain checks or classes of checks, the money thus deposited must be applied for the purposes for which it was deposited." *Re Warren's Bank*, 209 Wis. 121, 244 N.W. 594, 595 (1932); *see also* Annotation, *Bank Deposit for Purpose of Meeting Certain Checks or Classes of Checks*, 86 A.L.R. 375, supplementing 24 A.L.R. 1111, 39 A.L.R. 1138. In this situation, the depositor and the bank have established a type of fiduciary relationship, seen by some courts as that of principal and agent, and by other courts as

that of a trust relationship. *Warren's Bank,* 244 N.W. at 595.

 In the present case, Kenosha S & L's president, Paul Gergen, knew that the Bear Realty check was being deposited in order to pay the check to Heritage Bank. He knew that the Bear Realty check had to be found and deposited in order to cover the check payable to Heritage Bank. Once the check was found and deposited, Wisconsin law required that Kenosha S & L use the deposit to pay the check to Heritage Bank. Kenosha S & L had that responsibility, whether it was paid on the same day or three days later, and once the funds were in the debtor's account, Kenosha S & L did in fact pay the check to Heritage Bank.

The court finds that the payment made by the debtor to Heritage Bank is not a preference under § 547(b). This decision constitutes the court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure and Rule 7052 of the Federal Rules of Bankruptcy Procedure. An order will be entered dismissing this adversary proceeding.

### ORDER DISMISSING ADVERSARY PROCEEDING

The debtor filed a petition under chapter 7 of the Bankruptcy Code on January 11, 1991, and the plaintiff, Michael F. Dubis, was appointed trustee on the same date. On April 17, 1991; the trustee filed a complaint against Heritage Bank and Trust Company ("Heritage Bank") alleging that a preferential transfer had occurred. On May 16, 1991, Stephen C. Mills and Guy D. Trecroci, the sole directors and shareholders of the debtor, filed a motion to intervene as defendants, and also filed a proposed answer. The court granted their motion to intervene, and the trustee then filed an amended complaint. On June 4, 1992, a trial was held.

The court has this date filed its written decision constituting the court's findings of fact and conclusions of law. In accordance with the court's written decision,

**IT IS ORDERED** that this adversary proceeding is hereby dismissed.

